1  EVE H. KARASIK (State Bar No. 155356)
   JOHN-PATRICK M. FRITZ (State Bar No. 245240)
2  ROBERT M. CARRASCO (State Bar No. 334642)
   LEVENE, NEALE, BENDER,
3  YOO & GOLUBCHIK L.L.P.
   2818 La Cienega Avenue
4  Los Angeles, California 90034
   Telephone: (310) 229-1234
5  Facsimile: (310) 229-1244
   Email: EHK@LNBYG.COM; JPF@LNBYG.COM; RMC @LNBYG.COM
6
7  Proposed Attorneys for Chapter 11
8  Debtor and Debtor in Possession

9          UNITED STATES BANKRUPTCY COURT
10           CENTRAL DISTRICT OF CALIFORNIA
              LOS ANGELES DIVISION
11

| | |
|---|---|
| 12  In re: | ) Case No.: 2:24-bk-11857-DS |
| | ) |
| 13  BEN NYE CO., INC., | ) Chapter 11 Case |
| | ) Subchapter V |
| 14       Debtor and Debtor in Possession. | ) |
| | ) **NOTICE OF MOTION AND MOTION** |
| 15  | ) **FOR AN ORDER: (1) SETTING BAR** |
| | ) **DATES FOR FILING PROOFS OF** |
| 16  | ) **CLAIM ARISING FROM ASSERTED** |
| | ) **ASBESTOS RELATED INJURIES AND** |
| 17  | ) **(2) APPROVING FORM AND MANNER** |
| | ) **OF NOTICE OF THE BAR DATE FOR** |
| 18  | ) **THE    FILLING    OF    ASSERTED** |
| | ) **ASBESTOS RELATED INJURY PROOF** |
| 19  | ) **OF    CLAIMS;    MEMORANDUM    OF** |
| | ) **POINTS    AND    AUTHORITIES;** |
| 20  | ) **DECLARATION  OF  DANA  NYE  IN** |
| | ) **SUPPORT THEREOF** |
| 21  | ) |
| | ) Hearing: |
| 22  | ) Date:   April 11, 2024 |
| | ) Time:   3:00 p.m. |
| 23  | ) Place: Courtroom 1639 |
| | )            255 East Temple Street |
| 24  | )            Los Angeles, CA 90012 |
| 25  | ) |
| 26  | ) |
| 27  | ) |

28

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 3

I.      STATEMENT OF FACTS ............................................................................................. 3

        A.      General Background ............................................................................ 3

        B.      The 2017 BNC Revenue Rise and Challenges Thereafter ................................. 4

        C.      Asbestos Lawsuits against BNC .......................................................... 5

        D.       Proposed Bar Date for Filing Proofs of Claim Asserted Asbestos
                Related Injuries and   Related Form and Manner of Notice ............................ .6

II.     ARGUMENT ................................................................................................................ 9

        A.      The Debtor's Proposed Notice Process Complies with the Federal

                Rules of Bankruptcy Procedure for Setting the Asserted Asbestos

                Claims Bar Date and the Form and Manner of Notice of such Claims

                Bar Date ................................................................................................ 9

        B.       A Robust Bar Date Publication Notice Process Can Bind Future
                Claimants of Asserted Asbestos Claims to the Asserted Asbestos
                Claim Bar Date .................................................................................. 10

III.    CONCLUSION .......................................................................................................... 13

DECLARATION OF DANA NYE ......................................................................................... 15

        A.      General Background .......................................................................... 15

        B.      The 2017 BNC Revenue Rise and Challenges Thereafter ................................. 17

        C.      Asbestos Lawsuits against BNC ........................................................ 18

        D.      Proposed Asserted Asbestos Claims Bar Date and Notice Process ................... ... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Caracciolo,*
No. ADV. 05-90348-H11, 2006 WL 6604324 (Bankr. S.D. Cal. Dec. 13, 2006) .................................................................................................................11

*Estate of Decedent Luciano Susino and All Other Statutory Beneficiaries of Decedent Luciano Susino to Allow the Filing of A Late Proof of Claim,*
Case No. 12-200000-MFW (Bankr. D. Del., Oct. 18. 2021) (ECF No. 4601) ......................12

*In re Energy Future Holdings,*
949 F.3d 806 (3d. Cir. 2020) .........................................................................................11, 12

*In re Grossman's,*
607 F.3d 114 (3d Cir. 2010) .................................................................................................10

*Mullane v. Central Hanover Bank & Trust Co.,*
339 U.S. 306, 70 S.Ct. 652 (1850) .......................................................................................11

*In re Overseas Shipholding, LLC,*
Case No. 12-20000, Transcript of Court Decision (Bankr. D. Del., Oct. 18. 2021) (ECF No. 4612) ...........................................................................................13

*In re Placid Oil Co.,*
753 F.3d 151 (5th Cir 2014) ...........................................................................................11, 12

*Tulsa Professional Collection Serv., Inc. v. Pope,*
485 U.S. 478 (1988) .............................................................................................................11

**Other State Cases**

*In re Overseas Shipholding, LLC,*
Case ......................................................................................................................................14

**Federal Statutes**

11 U.S.C.
§ 1182(1) .............................................................................................................................15
§ 1183(a) ...............................................................................................................................3

**Bankruptcy Code**
§ 363(m) ...............................................................................................................................12
§ 524(g) ...........................................................................................7, 10, 11, 12, 13, 19
§§ 1107 and 1108 ..................................................................................................................3
§§ 1182(2) and 1184 ........................................................................................................3, 15

**Other Authorities**

Fed.R.Bankr. P. 2002(a)(7) and (f) ............................................................................... 9

Fed R. Bankr. P. 2002(l) ............................................................................................... 10

Fed. R. Bankr. P. 3003(c)(2) ..................................................................................... 9, 10

Fed. R. Bankr.P. 3003(c)(3) ........................................................................................... 9

Local Bankruptcy Rule 9013-1(f) ................................................................................... 1

Local Bankruptcy Rule 9013-1(h) .................................................................................. 2

**TO THE HONORABLE DEBORAH J. SALTZMAN UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, ALL PARTIES REQUESTING SPECIAL NOTICE, AND OTHER INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that a hearing will be held on April 11, 2024 at 11:30 a.m., before the Honorable Deborah J. Saltzman, United States Bankruptcy Judge for the Central District of California, Los Angeles Division, via ZoomGov, for the Court to consider the motion (the "Motion") filed by Ben Nye Co., Inc. the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor") for an order (1) setting bar dates for filing proofs of claim arising from known and future asserted asbestos related injuries and (2) approving form and manner of notice of the bar date for the filling of known or future asserted asbestos related injury proofs of claim. (There will be different bar dates set and noticed for claims that are not asserted asbestos related injury proofs of claims.)

**PLEASE READ THIS DOCUMENT CAREFULLY TO DETERMINE THE BASIS FOR THE REQUESTED RELIEF.** The specific grounds for the Motion are set forth in detail in the attached Memorandum of Points and Authorities and Declaration of Dana Nye.

**PLEASE TAKE FURTHER NOTICE** that the hearing on the Motion will be conducted via ZoomGov. Accessibility information to enable parties to appear at the hearing via ZoomGov will be provided by the Court in its tentative ruling prior to the hearing. Parties may obtain such accessibility information on the Court's posted hearing calendar which may be viewed online at http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/?jid=SC. Any parties that wish to appear in person must notify the Courtroom Deputy at least 24 hours before the hearing.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), any response to the Motion must be in writing and filed with the Clerk of the Bankruptcy Court and served upon the United States Trustee and counsel for the Debtor at the address set forth in the upper left-hand corner of the first page hereof not later than fourteen (14) days prior to the scheduled hearing date set forth above.

/ / /

1

1    **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

2   1(h), the Court may deem the failure of a party in interest to file a timely response to the Motion

3   to constitute consent to the granting by the Court of the relief requested by the Debtor in the

4   Motion without further notice or hearing.

5   Dated:  March 21, 2024              BEN NYE CO., INC.

6

7                                       By:_____

8                                          EVE H. KARASIK
                                           JOHN-PATRICK M. FRITZ
                                           ROBERT M. CARRASCO
9                                          LEVENE, NEALE, BENDER, YOO
                                               & GOLUBCHIK L.L.P.
10                                         Proposed Attorneys for Debtor and Debtor in
                                           Possession
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

## STATEMENT OF FACTS

**A.    General Background.**

1.    Ben Nye Co., Inc. (the "Debtor") filed a voluntary petition for relief under Subchapter V of Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on March 11, 2024 (the "Petition Date"). The Debtor continues to manage its financial affairs and operate their bankruptcy estates as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.    The United States Trustee (the "UST") is expected to appoint a subchapter V trustee (the "Trustee") pursuant to 11 U.S.C. § 1183(a).

3.    The Debtor continues to manage its financial affairs, operate its business, and administer its bankruptcy estate as a debtor in possession pursuant to sections 1182(2) and 1184 of the Bankruptcy Code.

4.    The Debtor was founded in 1966 by Ben Nye, Sr., a renowned make-up artist whose career spanned four decades.

5.    Ben Nye Sr. served as makeup director of 20th Century Fox Studio ("Fox Studio") for 23 years and supervised the production of over 500 feature films. He worked on the iconic "Gone with the Wind", making up Olivia de Havilland, Leslie Howard and Hattie McDaniel, the first Black actor to win an academy award. In 1968, Ben Nye Sr. was awarded a special Academy Award for Makeup for his last film work on "Planet of the Apes."

6.    Based on his vast experience, Ben Nye Sr. developed his own line of professional cosmetics especially formulated for high intensity lighting and durability. He also designed make-up for every skin tone, including a complete line for Black, Hispanic and Asian performers. After he retired from Fox Studio in 1967, he began selling his own line of makeup primarily to film studios.

7.    In 1970, Ben Nye Sr.'s son, Dana Nye, joined the company as Vice President of Sales and began marketing the Ben Nye make-up line to college and high school drama

3

departments across the country. The Company began advertising in Theatre Craft, an industry magazine circulated to drama departments and theatre companies and began exhibiting at trade shows catering to costume shops and contacting theatre supply houses. Over the years, the Company developed an extensive line of student makeup kits designed for the educational theatre marketplace.

8.    In May 1975, Ben Nye Sr.'s health declined, and Dana Nye become the Company's President. In July 1979, Dana Nye purchased all of the Company's shares and became the sole shareholder until March 2020, when Dana Nye assigned his BNC shares to the "Dana Nye and Gina Nye, as trustees of the Nye Family Trust U/T/D April 11, 2012."

9.    As president, Dana Nye has been dedicated to enhancing the quality and image of BNC products. He has traveled extensively exhibiting at trade shows and building a network of authorized dealers, who own brick and mortar stores marketing to the performing arts.  The Company's market has not been directed toward the general public, commonly referred to "streetwear" make up.

10.    The Company is a family business with a good work environment. Of its 35 employees, 16 employees have worked there between 11 to 38 years. Excluding the owners, the average service tenure is 13 years. The knowledge and productivity of its employees has been instrumental in developing new products, improving product quality and providing excellent product delivery.

11.    Today, the Company is considered a leading manufacturer of professional **cosmetics, which are sold throughout the United States and abroad. It is recognized for its high** quality, extensive product line and excellent customer service.

**B.    The 2017 BNC Revenue Rise and Challenges Thereafter**

12.    In 2013, the Company had gross revenues of $8,732,138.  In a 2014 interview Kim Kardashian's make-up artist mentioned he used the Company's banana powder on Kim. Given Kim Kardashian's celebrity star status, this interview sparked a surge in public demand for the Company's banana powder and boosted sales of other Company products, resulting in 2014 gross revenue of $10,157,999. In response, however, most of the Company's competitors copied the

banana powder, and Kim Kardashian introduced her own line of make-up, as well, cutting deeply into the Company's sales for the next few years. By 2017, the unusually high demand for BNC products subsided, and BNC revenue fell back to the 2013 levels.

13.     By 2018, long-time brick and mortar dealers began to retire or close business in response to e-commerce. The Company's largest dealers transitioned to expand their on-line business.  For the first time, the Company's revenue started to decline, but the business remained marginally profitable.

14.     In 2020, the impact of the Covid-19 pandemic, hit the Company very hard.

15.     Covid-19 restrictions shut down the performing arts, and colleges, universities, and Halloween activities stopped. The Covid-19 revenue impact on the Company's business was devastating as the Company's gross revenues fell 42% from the prior year.

16.     Despite terminating 25% of the Company workforce, managers taking payroll cuts, and the Company cutting all expenses to the bone, the Company incurred a significant net loss of $718,304 in 2020.

17.     In the second half of 2021, Covid-19 restrictions eased, and the business started to slowly recover. Although 2021 revenue fell back to the 2005 level, the Company managed an operating income of $258,102. The Company's net income was significantly boosted to $2,045,644 from two forgiven PPP loans totaling $1,182,014, and ERTC filings of $645,865.

18.     In 2023, the Hollywood writers' and actors' strikes and an exceptionally weak Halloween season adversely affected the Company's revenue, which declined to $5,554,300 from $5,809,725 in 2022.

## C.     Asbestos Lawsuits against BNC

19.     In December 2004, the Company received a lawsuit filed by Ms. Audrey Giero claiming personal injury from alleged exposure to asbestos allegedly in the Company face powder she used. This was the first lawsuit against the Company for any personal injury claimed from its products. The Company did intensive research and found no evidence of asbestos in its products. The Company did not have insurance for this type of claim and spent about $50,000 in its defense. The case was dismissed in 2005 without settlement.

20. Seventeen years later, and still while weathering the impact of Covid-19, in July 2021, the Company received its second lawsuit filed by Mr. David Rody claiming personal injury from alleged exposure to asbestos allegedly in BNC face powder he had used. The Company denies that it manufactured face powders that contained talk with asbestos. In the Rody case, the Company was among 60 defendants and vigorously defended its position, spending $513,929 in legal fees, including a settlement of $37,500 in May 2023.

21. Since July 2021, the Company has been named as a defendant in eight (8) more asbestos lawsuits. In these lawsuits, the Company is named with multiple defendants, including many very large well-known companies, (e.g., Maybelline LLC, Kaiser Gypsum Company, Inc., and Walgreen, Co., among many others).

22. Asbestos related personal injury lawsuits are complex and expensive to defend, and the Company has no insurance for its defense. The Company legal fees defending these cases have steadily risen. The Company incurred related legal fees of $62,513 in 2021, $301,945 in 2022, and $407,289 in 2023. These continued legal fees are unsustainable for the Company. The twin burdens of legal fees and revenue decline outside of the Company's control resulted in a net income loss of $453,102 for the year ending December 31, 2023. As a result the cash position has been substantially depleted. The Company is a defendant in an asbestos trial scheduled for April 15, 2024, in California. Legal counsel has advised the Company that this trial is likely to incur legal fees between $400,000 and $500,000. Such an amount will fully exhaust the Company's present cash position and effectively stop its ability to operate. Furthermore, the Company would not have any resources to defend against its remaining lawsuits.

**D.    Proposed Bar Date for Filing Proofs of Claim Asserted Asbestos Related Injuries and Related Form and Manner of Notice.[1]**

23. As described above, the Debtor was compelled to file this chapter 11 bankruptcy case due to the filing of eight (8) lawsuits (the "Actions") filed by plaintiffs with asserted asbestos related injuries arising out of alleged exposure to certain of the Debtor's products. In bankruptcy

---

[1]The Debtor will be filing a separate motion to set bar dates and approve the form and manner of notice for claims that are not asserted asbestos related injury proofs of claims.

cases with asserted asbestos related injury claims ("Asserted Asbestos Claims"), the claims of future claimants must be addressed as asbestos related injuries arise many years after exposure to the asbestos containing product. In the usual bankruptcy case with Asserted Asbestos Claims, the debtor has insurance and/or other sources of funding for these claims and proposes a plan of reorganization under section 524(g) of the Bankruptcy Code ("Section 524(g) Plan"). Under a Section 524(g) Plan where a debtor has insurance coverage for the Asserted Asbestos Claims, contributions from the insurers primarily fund a trust created through the Section 524(g) Plan to pay approved Asserted Asbestos Claims (the "Section 524(g) Trust"). In exchange for the insurer's contributions to the Section 524(g) Trust, the contributing insurers receive the benefit of a channeling injunction that bars claimants holding Asserted Asbestos Claims from bringing actions against the contributing insurers. The debtor engages actuaries to estimate the number of potential future claimants and then establishes a payment percentage of the Section 524(g) Trust funds to be made to holders of approved existing Asserted Asbestos Claims so that existing and future claimants holding approved Asserted Asbestos Claims receive substantially similar recoveries.

24.    Here, the Debtor is unaware that it owns any insurance policies that would provide coverage for the Asserted Asbestos Claims. As will be evidenced in the Debtor's to be filed Schedules of Assets and Liabilities, the Debtor is a very small company and has insufficient assets and no source of funding for a Section 524(g) Plan. Accordingly, it is not possible for the Debtor to propose a Section 524(g) Plan.

25.    Based on the authorities cited below, the Debtor can bind future claimants to a current claims bar date without a Section 524(g) Plan if it engages in a robust claims bar date notice process that includes publication notice. Accordingly, the Debtor proposes that the Court approve the following proposed claims bar date notice process for holders of all existing and future Asserted Asbestos Claims (the "Proposed Notice Process"):

- A claims bar date for Asserted Asbestos Claims (the "Asserted Asbestos Claims Bar Date") that provides at least 45 days' notice of the deadline to file proofs of claim, i.e., May 26, 2024.

- The detailed form of notice of the bar date solely for Asserted Asbestos Claims (the "<u>Bar Date Notice</u>") attached to the Nye Declaration as **Exhibit A**.

- Service of the Bar Date Notice by first class U.S. Mail on all of the Debtors' existing and former employees, dealers, and the plaintiffs' counsel in the Actions.

- Publication of the Bar Date Notice in the following publications:

  i. New York Times – National Edition; publish one time no later than two weeks after entry of the order granting this Motion (the "<u>Order</u>");

  ii. Los Angeles Times – publish on two dates (no later than two (2) weeks after entry of the Order, and no later than four (4) weeks after entry of the Order);

  iii. Variety -- publish on two dates (no later than two (2) weeks after entry of the Order, and no later than four (4) weeks after entry of the Order);

  iv. Mealey's Litigation Report Asbestos -- publish on three dates (no later than two (2) weeks after entry of the Order, four (4) weeks after entry of the Order, and five (5) weeks after entry of the Order, respectively); and

  v.  Mealey's Asbestos Bankruptcy Reports -- publish on three dates (no later than two (2) weeks after entry of the Order, four (4) weeks after entry of the Order, and five (5) weeks after entry of the Order, respectively)

26.    The Debtor believes that the Proposed Notice Process is robust and will provide both existing and future claimants holding Asserted Asbestos Claims more than adequate notice of the Asserted Asbestos Claims Bar Date. The Proposed Notice Process includes a detailed Bar Date Notice that provides all known and future holders of Asserted Asbestos Claims with the

information they need to timely file a proof of claim in the Debtor's bankruptcy case, including the Asserted Asbestos Claim Bar Date, who must file a proof of claim, the filing procedures, the consequences of failing to timely file a proof of claim, and where parties can find further information regarding the Debtor's bankruptcy case. The Debtor will mail the Bar Date Notice directly to known potential holders of Asserted Asbestos Claims by first class U.S Mail. In addition, the Debtor proposes to publish the Bar Date Notice in five (5) publications consisting of a national newspapers (the New York Times) the regional newspaper for the area where the Debtor's manufacturing facility is located (the Los Angeles Times), one of the leading entertainment journals as the Debtor manufactures theatrical make-up (Variety), and two (2) asbestos litigation reporting services used regularly by plaintiffs' firms that bring Asserted Asbestos Claims actions (Mealey's Asbestos Litigation Reports Asbestos and Mealey's Asbestos Bankruptcy Reports). The Debtor proposes to publish the Bar Date Notice multiple times in a 45 day period.  The expansive Proposed Notice Process is specifically designed to notify all known and future holders of potential Asserted Asbestos Claims of the Asserted Asbestos Claims Bar Date.

## II.    ARGUMENT

**A.    The Debtor's Proposed Notice Process Complies with the Federal Rules of Bankruptcy Procedure for Setting the Asserted Asbestos Claims Bar Date and the Form and Manner of Notice of such Claims Bar Date.**

There are several Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that govern the setting of a claims bar date in a bankruptcy case, and the required form and manner of providing notice of that bar date to creditors. Bankruptcy Rule 3003(c)(3) provides that the Court "shall fix . . . the time within which proofs of claim . . . may be filed" by establishing filing deadlines. Fed. R. Bankr.P. 3003(c)(3). Pursuant to Bankruptcy Rule 3003(c)(2), a creditor must file a proof of claim by the applicable deadline established by the Court if that creditor's claim (a) is not listed in the debtor's schedules of assets and liabilities (the "Schedules") or (b) is listed in the Schedules as disputed, contingent, or unliquidated. Fed. R. Bankr. P. 3003(c)(2).

Pursuant to Bankruptcy Rules 2002(a)(7) and (f) the Debtor must provide 21 days' notice by mail to all creditors of the deadline to file claims. Fed.R.Bankr. P. 2002(a)(7) and (f). Here,

1   the Debtor's Proposed Notice Process will provide 45 days' notice of the Asserted Asbestos

2   Claim Bar Date.

3          Bankruptcy Rule 2002(l) provides that "[t]he court may order notice by publication if it

4   finds that notice by mail is impracticable or that it is desirable to supplement the notice." Fed R.

5   Bankr. P. 2002(l). Such notice is appropriate for (a) those creditors to whom no other notice was

6   sent and who are unknown or not reasonably ascertainable by the debtor; (b) known creditors

7   with addresses unknown by the debtor; and (c) creditors with potential claims unknown by the

8   debtor. The Debtor proposes an expansive publication notice program described above and

9   designed to provide notice of the Asserted Asbestos Claims Bar Date to future claimants holding

10  Asserted Asbestos Claims.

11         If a creditor is required to file a proof of claim but fails to do so by the applicable

12  deadline established by the Court, Bankruptcy Rule 3003(c)(2) provides that such creditor "shall

13  not be treated as a creditor with respect to such claim for the purposes of voting and

14  distribution." Fed. R. Bankr. P. 3003(c)(2). Accordingly, the Debtor requests that any holder of a

15  an Asserted Asbestos Claim against the Debtor that is required to file a proof of claim in

16  accordance with an entered order of the Court granting this Motion, but fails to do so on or

17  before the Asserted Asbestos Claim Bar Date, shall (a) be forever barred, estopped, and enjoined

18  from asserting such a claim against the Debtor, their property, or their estates (or submitting a

19  proof of claim with respect thereto) and (b) not be treated as a creditor with respect to such claim

20  for the purposes of voting and distribution with respect to any chapter 11 plan of reorganization

21  that may be filed in this bankruptcy case.

22

23  **B.      A Robust Bar Date Publication Notice Process Can Bind Future Claimants of
            Asserted Asbestos Claims to the Asserted Asbestos Claim Bar Date.**

24         A robust publication notice process can bind future claimants of Asserted Asbestos

25  Claims to a claims bar date set by the Court. Although confirmation of a Section 524(g) Plan that

26  creates a Section 524(g) Trust is the preferred process for a chapter bankruptcy case with

27  Asserted Asbestos Claims, courts have set binding bar dates for Asserted Asbestos Claims,

28  including for future claimants, where a Section 524(g) Plan is not feasible. *In re Grossman's*,

607 F.3d 114 (3d Cir. 2010)("a Bankruptcy Code section 524(g) trust created under a chapter 11 plan is required for the treatment of unknown future asbestos-related claims, unless, among other considerations the debtor can show that "it was unreasonable or impossible for the debtor to establish a trust for future claimants a provide by [section] 524(g).")

Although not a case involving future claimants of Asserted Asbestos Claims, the United States Supreme Court held in case *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652 (1850) that publication notice of a claims bar date is effective to discharge claims held by unknown claimants so long as the publication notice is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.; see, e.g., In re Caracciolo*, No. ADV. 05-90348-H11, 2006 WL 6604324, at *4 (Bankr. S.D. Cal. Dec. 13, 2006)("The standard set forth in Mullane is flexible and whether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case. *Tulsa Professional Collection Serv., Inc. v. Pope*, 485 U.S. 478, 484 (1988)(emphasis added)").

The United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit") and United States Court of Appeals for the Third Circuit (the "Third Circuit")[2] have held that proper publication notice of a claims bar date can function to bar the claims of unknown future claimants such as unknown asbestos-related injury claimants. *In re Energy Future Holdings*, 949 F.3d 806 (3d. Cir. 2020); *In re Placid Oil Co.*, 753 F.3d 151, 157 (5th Cir 2014).

In *Placid Oil*, the Third Circuit held ". . . that because a bar date notice need not inform unknown claimants of the nature of their potential claims, Placid's notices were substantively sufficient to satisfy due process. Placid's notice informed claimants of the existence of the bankruptcy case, the opportunity to file proofs of claim, relevant deadlines, consequences of not filing a proof of claim, and how proofs of claim should be filed. We decline to articulate a new rule that would require more specific notice for unknown, potential asbestos claimants." *Id.* at 158. Importantly, the Fifth Circuit in Placid Oil described the publication notice used and

---

[2] There appear to be no applicable cases on this issue from the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit") or lower courts in the Ninth Circuit.

deemed it sufficient as follows:

> On three occasions in January 1987, Placid published a Notice of Bar Date in the Wall Street Journal, a newspaper of national circulation available in Louisiana. The notice informed creditors of the existence of the bankruptcy case, their opportunity to file proofs of claim, relevant deadlines, consequences of not filing a proof of claim, and how proofs of claim should be filed.

*Placid Oil,* 753 F.2d at 153.

In another very large Third Circuit case with over 10,000 known claimants with latent asbestos-related injury claims, which involved an asset sale to a third party buyer, the Third Circuit affirmed the Bankruptcy Court's holding that unknown future creditors' claims were discharged because allowing these claims would result in an increase of the negotiated purchase price for future liability that the buyer did not bargain for pursuant to Bankruptcy Code section 363(m).  *In re Energy Future Holdings*, 949 F.3d 806 (3d. Cir. 2020). In the opinion, the Third Circuit noted that the debtor had provided extensive publication notice consisting of the engagement of a noticing expert and notice being published "in seven consumer magazines, 226 local newspapers, three national newspapers, forty-three Spanish-language newspapers, eleven union publications, and five Internet outlets." *Id.*, at 823. The Third Circuit also noted that the $2 million spent in notice publication produced a "similar result as a 524(g) trust," but warned that a debtor that seeks to bypass a Section 524(g) Trust does so at its own peril. *Id.*

In  the *In re Overseas Shipping Group, Inc.* case, Case No. 12-200000-MFW, pending in the United States Bankruptcy Court for the District of Delaware, the Bankruptcy Court considered the issue of publication notice substituting for a Section 524(g) Trust when considering the *Motion of Carmelo Susino, on Her Behalf and on Behalf of the Estate of Decedent Luciano Susino and All Other Statutory Beneficiaries of Decedent  Luciano Susino to Allow the Filing of A Late Proof of Claim,* Case No. 12-200000-MFW, (Bankr. D. Del., Oct. 18. 2021) (ECF No. 4601) (the "Susino Motion").  In granting the Susino Motion, the Bankruptcy Court found that while a Section 524(g) Trust is not required, publication notice was insufficient in that case as "the publication was once in only three publications and according to the creditors, not published in any publication that a common laborer or able- bodied seaman, who

had served on the debtor's vessels, could  honestly be expected to have read. I don't expect seamen read the Financial Times or even industry publications to shipbuilders." *In re Overseas Shipholding, LLC*, Case No. 12-20000, Transcript of Court Decision at 52 (Bankr. D. Del., Oct. 18. 2021) (ECF No. 4612). A true and correct copy of the Overseas Shipbuilding Transcript of Court Decision is annexed hereto as **Exhibit A** to the Motion. In addition, the Overseas Shipbuilding bar date notice was generic with no reference to asserted asbestos claims. *Id*. In contrast, the Debtor's Proposed Notice Process includes a Bar Date Notice specifically focused on Asserted Asbestos Claims, and proposes multiple publication dates in five (5) publications specifically tailored to reach holders of potential existing and future Asserted Asbestos Claims.

Given the Debtor's inability to confirm a Section 524(g) Plan as it lacks insurance coverage or other sources of funding for a Section 524(g) Trust, there is ample authority that supports the Court's fixing of a bar date for future claimants' Asserted Asbestos Claims based on the Debtor's robust Proposed Notice Process, which incorporates broad publication notice tailored in content and distribution scope to reach its particular potential unknown future claimants with Asserted Asbestos Claims.

## V.    CONCLUSION

For the reasons set forth above, the Debtor respectfully requests that the Court enter an order (i) granting the Motion in its entirety; (ii) approving the Proposed Notice Process, including the Asserted Asbestos Claims Bar Date; and (iii) granting such other and further relief the Court deems just and proper.


Dated:  March 21, 2024                    BEN NYE CO., INC.


By:_____
            EVE H. KARASIK
            JOHN-PATRICK M FRITZ
            ROBERT M. CARRASCO
            LEVENE, NEALE, BENDER, YOO
                & GOLUBCHIK L.L.P.
            Attorneys for Post-Effective Date Debtor

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>**EXHIBIT A**</u>

***In re Overseas Shipholding, LLC*, Case no. 12-20000, Transcript of Court Decision at 52 (Bankr. D. Del., Oct. 18. 2021) (ECF No. 4612)**

```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

                                         .    Chapter 11
 3    IN RE:                             .
                                         .    Case No. 12-20000 (MFW)
 4    OVERSEAS SHIPHOLDING GROUP,        .
      INC, et al.,                       .
 5                                       .
                                         .
 6                                       .    Courtroom No. 3
                                         .    824 Market Street
 7                                       .    Wilmington, Delaware 19801
                                         .
 8          Reorganized Debtors.   .    September 28, 2021
      . . . . . . . . . . . . . . . .    2:00 P.M.
 9

10              TRANSCRIPT OF TELEPHONIC HEARING
              BEFORE THE HONORABLE MARY F. WALRATH
11                UNITED STATES BANKRUPTCY JUDGE

12
      TELEPHONIC APPEARANCES:
13
      For the Reorganized          Thomas Kessler, Esquire
14    Debtors:                     CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                   One Liberty Plaza
15                                 New York, New York 10006

16    For Carmela Susino:          Natalie Ramsey, Esquire
                                   ROBINSON & COLE LLP
17                                 1201 N. Market Street, Suite 1406
                                   Wilmington, Delaware 19801
18

19
      Audio Operator:              Mandy Bartkowski, ECRO
20

21    Transcription Company:       Reliable
                                   1007 N. Orange Street
22                                 Wilmington, Delaware 19801
                                   (302)654-8080
23                                 Email:  gmatthews@reliable-co.com

24    Proceedings recorded by electronic sound recording,
      transcript produced by transcription service.
25
```

<u>MATTER GOING FORWARD</u>:

1. Motion of Carmela Susino, on Her Own Behalf and on the
Behalf of the Estate of Decedent Luciano Susino and All Other
Statutory Beneficiaries of Decedent Luciano Susino to (I)
Reopen Chapter 11 Case and (II) Modify the Discharge
Injunction to Pursue Insurance Coverage and Allow the Filing
of a Late Proof of Claim (D.I. 4599, filed 8/19/21)

2. Motion of Carmela Susino, on Her Own Behalf and on Behalf
of the Estate of Decedent Luciano Susino and All Other
Statutory Beneficiaries of Decedent Luciano Susino to Allow
the Filing of a Late Proof of Claim (D.I. 4601, filed
8/19/21)

   **Ruling:  50**


<u>EXHIBITS</u>:                          ID    Rec'd

Declaration of Damon Mote                      4

1         (Proceedings commenced at 2:01 p.m.)

2              THE COURT:  Good afternoon.  This is Judge

3    Walrath.  We're here in Overseas Shipholding Company.

4              I will turn it over to counsel for the debtor to

5    introduce what is on the agenda.

6              MR. KESSLER:  Good afternoon, Your Honor.  Tom

7    Kessler from Cleary Gottlieb on behalf of the reorganized

8    debtor OSG.

9              We're here today on the motions of the Susino's to

10   reopen the Chapter 11 case of Overseas Shipholding Group and

11   to allow the late filing of a proof of claim.  Those are

12   reflected as agenda items number 1 and 2 on Your Honor's

13   agenda.  And we are also here, of course, on the cross motion

14   of OSG to enforce a confirmation order.

15             Your Honor, given that today's hearing was

16   precipitated by the Susino's motions I will cede the podium

17   to my friend on the other side, but I do want to briefly

18   begin with a bit of housekeeping which is that as Your Honor

19   saw in connection with OSG's opposition and cross motion we

20   filed the declaration by Mr. Damon Mote.  Mr. Mote is the

21   vice president and chief administrative officer of OSG and

22   his declaration is at ECF No. 4604-3.

23             I believe that Mr. Mote is on the line this

24   afternoon and is happy to answer questions the court may

25   have.  That said, he does have a pressing commitment that he

1  stepped away from in order to attend this afternoon's hearing

2  and so subject to Your Honor's views we would ask that his

3  declaration be moved into evidence and that subject to any

4  questions Your Honor may have that he be excused from the

5  courtroom.

6        THE COURT:  Alright, is there any objection to

7  admitting his declaration?

8        MS. RAMSEY:  No objection, Your Honor.

9        THE COURT:  Alright, Ms. Ramsey, do you wish to

10  cross-examine the declarant?

11        MS. RAMSEY:  No, Your Honor.

12        THE COURT:  Alright, then he may be excused and it

13  will be admitted.

14     (Declaration of Damon Mote received into evidence)

15        MR. KESSLER:  Wonderful.  Thank you very much,

16  Your Honor.

17        With that I will happily cede the digital podium

18  to Ms. Ramsey.

19        THE COURT:  Alright.

20        MS. RAMSEY:  Thank you, Your Honor.  For the

21  record Natalie Ramsey of Robinson & Cole appearing on behalf

22  of the estate of Luciano Susino and his beneficiaries.

23        We are here today on our motion to reopen the

24  Overseas Shipholding Group bankruptcy case to permit Mr.

25  Susino's beneficiaries to file a late proof of claim in the

1  case.  Mr. Susino did not timely file a proof of claim in

2  response to the bar date which was established as May 31st of

3  2013.  Mr. Susino learned that he had mesothelioma and

4  asbestos exposure related cancer on February 28th, 2017.  He

5  passed away on March the 5th, 2018.  Mr. Susino resided in

6  Sicily.

7         Mr. Susino was an unmanifested asbestos claimant

8  at the time of the OSG bankruptcy case.  As an unmanifested

9  asbestos claimant they are sometimes called future claimants,

10 sometimes known as demand holders under Section 524(g),

11 sometimes referred to as latent asbestos claimants.  That is

12 someone who has been exposed to asbestos but has not yet

13 contracted an asbestos disease because of a latency

14 associated with asbestos injury.

15         Neither Mr. Susino nor his beneficiaries knew of

16 the OSG bankruptcy.  Neither Mr. Susino nor his beneficiaries

17 received notice of the bar date or the plan or

18 reorganization.  And we continued that Mr. Susino's claim is

19 not discharged by the OSG bankruptcy and that he should be

20 permitted to file a late proof of claim because he did not

21 receive procedural due process in connection with the bar

22 date as required by (indiscernible) and its progeny.  And to

23 the extent that the bar date notice was legally sufficient

24 his failure to file a claim was the result of excusable

25 neglect.

1           OSG takes the position that the bankruptcy court's

2   determination that publication notice was sufficient ends the

3   inquiry; however, the Third Circuit in the Grossman's

4   decision made clear that,

5           "Whether a particular claim has been discharged by

6   a plan of reorganization depends on factors applicable to the

7   particular case and is best determined by the appropriate

8   bankruptcy court or the District Court.  In determining

9   whether an asbestos claim has been discharged the court may

10  wish to consider (indiscernible) the circumstances of the

11  initial exposure to asbestos, whether and/or when the

12  claimants were aware of their vulnerability to asbestos,

13  whether the notice of the claims bar date came to their

14  attention, or that the claimants were known or unknown

15  creditors, whether the claimants had a colorable claim at the

16  time of the time of the bar date, and other circumstances

17  specific to the parties including whether it was reasonable

18  or possible for the debtor to establish a trust for future

19  claimants as provided by Section 524(g)."

20          The Grossman's decision was entered on April 27th,

21  2010 over two years before OSG filed its bankruptcy cases on

22  November 14th, 2012.  And unlike the Grossman's facts here

23  OSG was aware that it had asbestos liability. It had over

24  7,000 pending claims at the time of its bankruptcy and it was

25  aware that it had asbestos claims based on asbestos exposure

1   occurring on its vessels stemming from alleged exposure for

2   the period 1960's through the 1990's.

3           According to the debtor's disclosure statement at

4   pages 46 to 47 the debtors had been leading owners and

5   operators of ocean going vessels for more than 40 years

6   including during the period that gave rise to thousands of

7   suits by mariners alleging exposure to asbestos while on

8   vessels owned or operated by the debtors and their current

9   and former affiliates.

10          The proofs of claims filed in these Chapter 11

11  cases include more than 7,000 claims alleging exposure to

12  asbestos or other occupational diseases.  The asbestos

13  proceedings typically accused debtors and non-debtor OSG

14  defendants and various other defendants of, among other

15  things, negligent maintenance of their vessels, negligence

16  under the Jones Act, and unseaworthiness under general

17  admiralty and maritime law.

18          That background is important to consideration of

19  the facts of what was done and what was not done in the OSG

20  bankruptcy case.  First of all, we do not contest that Mr.

21  Susino had an unmanifested asbestos claim at the time of the

22  bankruptcy case.  From 1978 through approximately 1980 Mr.

23  Susino worked as a seaman and crew member on board various

24  OSG vessels including the Eastern Line.  Mr. Susino alleges

25  that in that capacity he handled, used or was exposed to

1 asbestos and asbestos contained products and equipment

2 without warning or protection which OSG knew was dangerous to

3 his health and could result in development of an asbestos

4 disease.

5        Because his employment predated the OSG bankruptcy

6 he held a claim, although unmanifested, based on that

7 exposure under applicable Third Circuit law.  As the court is

8 aware, asbestos disease has a long latency period.  In

9 particular mesothelioma has an average latency period of 35

10 to 40 years.  Mr. Susino's diagnosis fell squarely within the

11 average latency period for development of mesothelioma.

12        Mr. Susino was also the exact type of claimant

13 that OSG knew existed, a mariner alleging exposure on a

14 vessel operated by OSG during the timeframe that others had

15 made such claims.  Mr. Susino's allegations fall squarely

16 within the allegations that individuals had made before and

17 at the time of OSG's bankruptcy.

18        The debtor specifically provided, in their plan,

19 for unimpaired asbestos claims to be reinstated upon the

20 later or the effective date, or the date of allowance of

21 those claims.  As the court is aware, an unimpaired claims

22 are claims filed by individuals who have no medical

23 impairment, but have noticed that they may develop and

24 asbestos disease because asbestos fibers have been identified

25 in their lungs.

1          Today, most state courts place those types of

2    claims on an inactive docket unless and until the claimant is

3    diagnosed with an asbestos disease at which point they are

4    then able to proceed with a lawsuit based on seeking

5    compensation for that disease.  An unimpaired asbestos claim

6    is a form of present claim.  What there is no evidence of in

7    the record of this case is if the debtor did anything to take

8    into consideration unmanifested claims.  Claims like those of

9    the plaintiffs in Grossman's.

10         The closest the debtors came to that was in

11   Paragraph 41 of the bar date motion where in discussing

12   publication notice they say such unknown potential claims

13   include, for example, claims of trade vendors who failed to

14   submit an invoice to the debtors, claims of former employees

15   and claims that, for various reasons, are not recorded on the

16   debtors' books and records.

17         Still, there was no effort by the debtor to

18   attempt to reach, other than through this publication notice

19   that we will talk about in a moment with respect to the bar

20   date, prior employees, prior mariners that served on those

21   vessels where the debtor knew it had been subject to asbestos

22   claims and had reason to know it might be subject in the

23   future to claims by those very same types of individuals who

24   would later develop an asbestos disease.  There is also no

25   dispute in this case that Mr. Susino was not provided with

1  direct notice of the bar date and that the debtor relies

2  exclusively on publication notice to reach Mr. Susino as part

3  of the group of unknown claimants.

4        The reorganized debtors contend that the bar date

5  -- I'm sorry, that the bankruptcy court's approval of the bar

6  date and publication notice should be controlling, but that

7  is not what Grossman's says and that is not what Energy

8  Future Holdings says.  The Third Circuit in Grossman's held

9  that Rule 3003(c)(3) -- I'm sorry, I think I'm quoting now

10  from Energy Future Holdings, not Grossman's.  The Third

11  Circuit held in Energy Future Holdings that Rule 3003(c)(3)

12  is capable of affording latent claimants a fair opportunity

13  post-confirmation to seek reinstatement of their claims.  And

14  the Third Circuit there said,

15        "It is true, as the plan points out, that they

16  must carry the burden of proof under Rule 3003(c)(3), but

17  that burden for these latent claimants is a light one.

18  Appellants need only file a basic motion reciting the fact

19  that reinstatement of their claims will neither prejudice,"

20  in that case EFH, "nor impact its bankruptcy proceedings and

21  attach a sworn affidavit explaining why they were deprived of

22  due process  under Grossman's."

23        We make two arguments in support of seeking to

24  file a late claim:

25        The first is that notice of the bar date was

1 insufficient both in content and in delivery.  As we have

2 noted in our papers there was no reference whatsoever in the

3 debtors' notice of bar date to the word "asbestos" let alone

4 any effort to reach individuals that spoke another language,

5 any attempt to reach individuals who had previously served on

6 these vessels, any effort to reach someone who was located

7 out of the country.

8        The content of the bar date is particularly at

9 odds with what the bankruptcy court approved in the Energy

10 Future Holdings case where there was a separate bar date

11 notice, one form that went to manifestoed claimants another

12 that went to unmanifested claimants, that provided notice to

13 those claimants to the fullest extent possible in multiple

14 languages through multiple efforts which included notices to

15 unions, notices to locations where the various people who

16 might have been exposed to asbestos were located, require

17 direct notice to all individuals that could have been

18 identified as previously having worked at premises that EFH

19 operated that contained asbestos.

20        The content of the notice in the EFH case notified

21 unmanifested claimants of the potential that they might have

22 been exposed to asbestos, that they might develop an asbestos

23 injury in the future, and that, therefore, in order to

24 preserve their right to proceed with a claim they were

25 required to file a claim.

1          If one were to look at the  content of the

2    unmanifested bar date notice, which is available on the

3    public docket in the <u>EFH</u> case at Docket Nos. 4985 and 4997,

4    and I guess another notice at 5171 of the <u>EFH</u> case, the court

5    would see that the unmanifested asbestos injury bar date

6    notice goes on for -- or the form itself goes on for several

7    pages explaining to someone what an unmanifested asbestos

8    injury is, notifying them that they may have been exposed,

9    and providing in plain English with respect to the English

10   part of the publication, at least, in plain language that

11   they needed, even if they were not yet experiencing symptoms,

12   to have filed this claim.

13          There is no such content present in what the OSG

14   bar date notice did which was more of a standard, sort of,

15   commercial bar date notice that was not in any way directed

16   content wise to provide notice to individuals that if they

17   had asbestos claims they needed to file those particularly

18   with respect to unmanifested claims.

19          With respect to delivery there was, as we said, an

20   effort only to publish one time in three publications notice

21   of the bar date.  One of those publications the debtor notes

22   was a maritime publication, but it is a maritime publication

23   that is not typically read by the seamen, but more of a

24   publication designed for the industry.  There has been no

25   allegation, there is nothing in the record to suggest that

1    there was an effort, again, to publish in a language other

2    than English or to reach someone who was a resident outside

3    the country; although, clearly OSG was aware that it had many

4    mariners who worked on its vessels who were not located in

5    the United States.

6         So our first argument is clearly with respect to

7    both content and delivery that the bar date notice did not

8    afford Mr. Susino any type of adequate due process notice of

9    his claims.

10        Our second argument is that if and to the extent

11   that the court were to disagree and find that that that

12   notice was sufficient, which we think is contrary to the

13   Third Circuit even in its discussion in appeals arising out

14   of EFH where the content and the breadth of the notice and

15   the good faith effort to reach all individuals who might have

16   an asbestos claim was critical to its determination of

17   adequacy of the notice in that case.  Even if the court were

18   to disagree here and find that under these circumstances the

19   notice was adequate we would contend that nonetheless Mr.

20   Susino should be permitted to file a claim based on excusable

21   neglect.

22        One of the things that the court observed in EFH

23   was -- again, to go back through the issue of notice for one

24   more second, is that there the claimants that appealed had

25   actually admitted that they received publication notice.  But

Case 2:24-cv-00080-MFW Document 1-42 Filed 13/21 Filed 16/04/21 Page 32 of 86 Page 146 of 5641 Desc
Main Document    Page 32 of 86

14

1  despite that admission the court went onto note the

2  extraordinary effort that it believed the debtor there had

3  taken to reach them.

4        With respect to excusable neglect, Your Honor, it

5  is clear that Mr. Susino falls within the criteria that

6  courts have permitted for filing late filed proofs of claim.

7  There are four criteria that are typically applied; prejudice

8  to the debtors, delay was not in the reasonable control of

9  the movement, the length of the delay and the impact on

10  judicial proceedings is considered, and finally good faith of

11  the claimant.

12        Here the United States Supreme Court has found

13  that through Rule 9006 Congress plainly contemplated that

14  courts would be permitted, where appropriate, to accept late

15  filings caused by an advertence in state, carelessness, as

16  well as, and this is the applicable standard here,

17  intervening circumstances.  The enlargement of time periods

18  and the ability to accept the filings where there is

19  excusable neglect is part and parcel of bankruptcy process

20  and the ultimate equitable objectives of the balancing of the

21  debtors' need and desire for a fresh start with the

22  fundamental due process rights of the creditors.

23        With respect to the criteria of prejudice to the

24  debtors the courts have instructed that they are to consider

25  several relevant factors including whether the debtor was

1    surprised or caught unaware of the assertion of a claimant

2    had not anticipated;

3              Number two, whether the payment of the claim would

4    force the return of amounts already paid out under the

5    confirmed plan or effect the distribution to creditors;

6              Number three, whether payment of the claim

7    distribution -- payment of the claim would jeopardize the

8    success of the debtors' reorganization;

9              Number four, whether allowance of the claim would

10   adversely impact the debtor actually or legally;

11             Number five, whether allowance of the claim would

12   open the floodgates to other future claims.  That is the

13   standard that was articulated in New Century TRS Holdings at

14   465 B.R. 51.

15             With respect to these criteria it is clear that

16   the debtor should not have been surprised or caught unaware.

17   As we said the debtor had great knowledge about its

18   asbestosis liabilities.  It was aware of the specific nature

19   of those liabilities, the specific exposures that were

20   alleged.  It was even aware that former employees might have

21   claims.  So here there certainly cannot be any surprise.

22             With respect to the second criteria of whether

23   payment would force the return of amounts already paid out

24   under the confirmed plan or effect the distribution to other

25   creditors that is also not an issue.  Here, the debtor has

1   reinstated and accepted to continue to litigate with asbestos

2   claims or reinstated.  Here, if the Susino's claim were to be

3   permitted the Susino's would simply have a right to prosecute

4   their claim against OSG, the reorganized debtors, and the

5   reorganized debtors would have all of the defenses that would

6   ordinarily be available to it in defense of those claims.

7          Number three, whether payment of the claim would

8   jeopardize the success of the debtors' reorganization, there

9   is no question that the debtor here accepted, it made a risk

10  calculation and accepted that there were going to be asbestos

11  claims that would exist post-confirmation.  It was aware of

12  524(g).  It could have provided for a 524(g) case.  It

13  elected not to do that.  It made a conscious determination

14  that it was going to deal with the risk of asbestos claimants

15  here so it should not now be heard to complain that payment

16  of the claim would somehow jeopardize part of what it thought

17  it had achieved through its reorganization.

18          The fourth criteria of whether allowance would

19  adversely impact the debtor actually or legally, allowance of

20  the claim would not adversely affect the debtor in any way

21  that any other claim would not.  The debtor might have

22  liability on this claim, the debtor might have to defend

23  against this claim, but the primary focus of the debtors

24  pleading really comes to this issue of would it open the

25  floodgates, would it open the floodgates to other future

1  claims.

2        With respect to that criteria, Your Honor, our

3  answer is we have no reason to believe it will.  The debtor

4  has said that there have been other claims that they have

5  elected to not prosecute against OSG ultimately, but with

6  respect to where we are now in the cycle of claims that had

7  been manifested you are getting now 35, 40 years from the

8  timeframe when Mr. Susino was on the debtors' vessels.  And

9  there is not a floodgates argument.  Might there be other

10  people similarly situated there might be.  There probably

11  even are other people similarly situated but with respect to

12  those, again, the debtor elected, affirmatively elected to

13  proceed in this fashion with respect to asbestos claims.

14        What we are talking about is simply the potential

15  that it would have to defend against those claims.  The

16  debtor counts its success in connection with prior asbestos

17  litigation based upon claims.  So other than the potential of

18  defending against those claims the debtor really has not

19  identified a potential of significant harm.

20        Turning to the criteria of delay not being in

21  reasonable control of the movant; obviously, this is a

22  criteria here that is easily satisfied.

23        The movant did not know, could not have known that

24  he had an asbestos disease until it was manifest.  It was

25  manifested in 2017.  That was well after the bar date, well

1   after the case had concluded, but this is a different type of

2   delay also then you experience in other types of creditor

3   situations.  That is why there is a 524(g) that is why there

4   is a whole area of jurisprudence devoted to asbestos

5   bankruptcies because in asbestos circumstances there are

6   latent injuries and they are outside of the reasonable

7   control of anyone.  They certainly were not anything that the

8   movant would have wanted, but he was manifested when he was

9   manifested and after that he has pursued his legal rights

10  within the appropriate timeframes.

11          With respect to the criteria of length of delay

12  and impact on the judicial proceedings the criteria there

13  really comes down to was there reasonable reliance by the

14  debtor that it would never have to face these types of

15  claims.  Our response to that is there shouldn't be, no

16  reasonable reliance.  In fact, we know that the debtor

17  anticipated that there would be some of these claims.

18          In terms of the debtors reliance on what it did,

19  knowing what it knew at teh time, there should be no

20  reasonable reliance that there would not be unmanifested

21  claims out there that were not properly noticed, actually

22  noticed, not given an adequate opportunity to be noticed by

23  the very limited publication notice and the very limited type

24  of information contained on the bar date.

25          Finally, Your Honor, with respect to good faith

1  there is no question that there was no gamesmanship here.

2  The Susino's moved as promptly as reasonably they could being

3  folks from out of the country to prosecute their rights and

4  to come before the court asking the court through appropriate

5  legal channels to provide them with the opportunity to file a

6  late claim so that they could prosecute their action against

7  the OSG entities.

8          At the end of the day, Your Honor, as the Supreme

9  Court has noted in Pioneer, this is really a determination at

10 bottom that is an equitable one.  These decisions in this

11 area typically come down to a balancing between the fresh

12 start and the due process and harm to the movant.  Here you

13 have a unique circumstance.  This is not Grossman's, this is

14 not a circumstance where the debtor was surprised after its

15 bankruptcy that there was an asbestos claim and is relying on

16 publication notice.

17         You had a debtor who knew that Grossman's was out

18 there, knew that there were asbestos claims, knew that it had

19 an option of choosing to have a 524(g) kind of plan and to

20 put together a pool of money that would be available for

21 future claimants.  They elected to take a risk that it would

22 handle those claims as they came forward and did not take

23 appropriate steps through a bar date to notify claimants that

24 they should file.

25         On the other hand you have an individual who was

1  exposed to asbestos who is now deceased, whose estate is

2  looking merely for the opportunity to prosecute that claim

3  and leave it to the appropriate trial court as to whether

4  that claim is properly held to be the responsibility of the

5  reorganized OSG entities.

6          Unless the court has questions I will cede the

7  podium.

8          THE COURT:  Alright, thank you.  I have no

9  questions.

10          MR. KESSLER:  Good afternoon, Your Honor.  Just

11  for the record, again, Tom Kessler from Cleary Gottlieb on

12  behalf of OSG.

13          Your Honor, I thought given the amount of time

14  it's been since we were all together a bit of background

15  might be helpful.  As Ms. Ramsey noted, the Chapter 11 cases

16  were filed nearly nine years ago in November of 2012.  In

17  April of 2013 the late Judge Walrath -- oh my goodness, late

18  Judge Walsh.

19          THE COURT:  Thank you.

20      (Laughter)

21          MR. KESSLER:  I apologize.  That bar date order

22  established May 31st, 2013 as the general bar date and it

23  provided it, as Ms. Ramsey noted, with a failure to file a

24  proof of claim by that date would result in potential

25  claimants being forever barred and estopped from asserting

1  those claims against the debtors.

2        The bar date order also approved the sufficiency

3  of the debtors' publication notice which involved publishing

4  the bar date in three publications; the Financial Times, in

5  International Financial Newspaper, the Tampa Bay Times a

6  newspaper widely read and distributed where the debtors had a

7  center of US operations, and Trade Winds a leading shipping

8  industry publication.

9        As Ms. Ramsey noted, by the general bar date more

10  then 7,000 (indiscernible) asserting asbestos related

11  liability were filed.  None of those claims were filed in

12  respect of the Susino's alleged liability.  Through the

13  Chapter 11 cases the debtors were able to expunge more than

14  6,600 of those claims and it was due to that significant

15  winnowing and in reliance on the bar date order, and

16  discharge injunction (indiscernible) --

17        THE COURT:  Sorry, you froze.

18        MR. KESSLER:  -- the debtors determined the

19  establishment of a Section 524(g) trust is not necessary.  I

20  apologize I will go back.

21        As I mentioned, Your Honor, the debtors were able

22  to expunge more than 6,600 of the 7,000 claims that were

23  filed in respect to asbestos related liability and it was the

24  result of that significant winnowing that the debtors

25  determined in conjunction with the bar date order and with

1   the discharge injunction that would be later embodied in the

2   confirmation order that it was not necessary to establish a

3   Section 524(g) trust.

4         I will return back to this in a moment, but I

5   think one of the themes in the Susino's presentation this

6   afternoon has really been that the debtors are faced with a

7   choice of either accepting unlimited liability for future

8   claims or establishing a Section 524(g) trust.  Effectively,

9   it's a mandatory feature of any case where there is asserted

10  asbestos liability.  That is simply not the law.  And, again,

11  the debtors here, as in many cases, are entitled to rely on

12  the sufficiency and enforceability of the bar date order and

13  the confirmation order.

14        The debtors proposed their plan in March of 2014

15  and in reliance on the plan and disclosure statement and the

16  information that they contained the solicited impaired

17  classes voted overwhelmingly in favor of the plan.  As a

18  result, on July 18th, 2014 Judge Walsh entered the

19  confirmation order.

20        As Your Honor knows, the plan and confirmation

21  order mandate that as of the effective date the debtors are

22  discharged and released to the full extent of the bankruptcy

23  code from any and all claims, and any persons or entities are

24  precluded from and enjoined of asserting any liability that

25  resulted or occurred prior to the effective date.

1     The plan went effective in August of 2014 and the

2   final Chapter 11 case was closed February 10th, 2017.  As

3   relevant to this afternoon's motions since the entry of the

4   confirmation order Your Honor has enforced the confirmation

5   order and the bar date order as it relates to a tort claimant

6   who sought to assert claims after the general bar date.

7     Turning then to the Susino action --

8     THE COURT:  Let's go back to the -- I think you

9   are referring to the Lammer [ph] claim motion?

10     MR. KESSLER:  Yes, Your Honor.

11     THE COURT:  But I just want to note for the record

12   that was after filing of a certificate of no objection.

13     MR. KESSLER:  That is certainly right, Your Honor.

14   The Lammer's did not object to our relief; although, again, I

15   think there has been -- the Lammer objection and the

16   (indiscernible) and I think speaks to the debtors' reliance

17   on the enforceability of the publication notice and having it

18   apply to prevent claims coming years after the closing of the

19   Chapter 11 cases.  Here, you know, even several years after

20   the Lammer's objection.

21     So turning back to the Susino action, as Your

22   Honor knows the Susino's filed their lawsuit in the Superior

23   Court of the Virgin Islands in Marcy 2021.  I think its

24   noteworthy here we're talking about the claims asserted

25   against OSG, but the Susino's assert that the claims against

Case 2:24-c-case 18-20080-D5W 42 Doc 46 Filed 12/21/21 Filed 16/04/21 03/30/22416 56:41    Desc
Main Document    Page 42 of 86

24

1  a significant number of defendants, including many large

2  corporations you typically see in these sorts of asbestos

3  actions, prior to the Susino's filing the relief that they

4  sought from Your Honor there was a series of correspondence

5  between us and the Susino's Virgin Island counsel where we

6  advised them that the Susino action was filed in violation of

7  the bar date order of the plan and confirmation order.

8         The final letter that we sent to them was on May

9  5th.  We received no response to that letter.  It was not

10  until the filing of this motion that there was further

11  substantive prosecution of the claims from the Susino's.  In

12  the meantime, on July 13th I should note, OSG did file a

13  motion to dismiss the Susino action on the basis of the bar

14  date, the plan, and the confirmation order in the Virgin

15  Islands.  That motion remains pending.

16         (Indiscernible), Your Honor, the Susino motions

17  argue that principally that Mr. Susino, an admitted unknown

18  creditor, was not provided constitutionally adequate notice

19  of the bar date.  Even if he was he should, therefore,

20  somehow be permitted to file a claim more than eight years

21  after the bar date plan.  This claim fails for multiple

22  reasons.

23         First, as an initial matter a fundamental

24  assumption that (indiscernible) the argument you heard from

25  Ms. Ramsey this morning is that Mr. Susino, an Italian

 1  citizen living abroad at the time of the bar date order, has

 2  due process rights under the United States Constitution.  The

 3  Supreme Court has been unequivocal for more than 70 years

 4  that absent limited circumstances not present here foreign

 5  citizens do not enjoy due process rights.  That has been --

 6         THE COURT:  Are you suggesting -- sitting in a

 7  court that has large international cases are you seriously

 8  suggesting that in a bankruptcy case in which you are

 9  presumably seeking extra territorial enforcement of my orders

10  that creditors that don't reside in the US are not entitled

11  to appropriate notice of those orders and not entitled to due

12  process rights however they are framed?

13         MR. KESSLER:  Your Honor, I am merely suggesting

14  that there have been courts in the claim context that have

15  held that foreign claimants are not entitled to due process.

16  That was in the Fourth Circuit in the Vancouver case.

17         THE COURT:  In 1987, is that right?

18         MR. KESSLER:  That's right.

19         It was also examined, again, in the General Motors

20  case by Judge Gerber, who also had determined that while

21  there was significant weight to that argument, he didn't need

22  to reach the issue and I think, fortunately, Your Honor, we

23  don't need to reach the constitutional issue here, either,

24  I'm sure as my constitutional law professor will be pleased

25  to hear, because at the end of the day, the adequacy of our

1 notice cannot be reasonably questioned.

2          I'll start with what I understand from this

3 afternoon's discussion are some uncontested facts.  First,

4 that Susino's asserted claims are pre-petition claims under

5 the Third Circuit's decision in <u>Grossman's</u>.  Mr. Susino

6 allegedly served on an OSG owned or operated vessel between

7 1978 and 1980, and he alleges that it was during that service

8 that he was exposed to asbestos.

9          Second, I think there's no dispute that Mr. Susino

10 was an unknown claimant.  As identified in the opposition,

11 OSG undertook significant efforts to identify all potential

12 creditors and claimants as part of its noticing efforts.

13 That effort did not result in the identification of

14 Mr. Susino and as set forth in the Moat (phonetic)

15 declaration, even in response to the filing of the Susino

16 action, OSG was unable to locate any sea-service records for

17 Mr. Susino.

18          As a result, I think there's no question that

19 Mr. Susino was not entitled to actual notice of the bar date,

20 but, rather, that publication notice like that employed by

21 OSG, is sufficient to satisfy the notice requirements for

22 unknown creditors.

23          Turning now to the distribution of the publication

24 notice, courts have long held that debtors are not expected

25 to publish a publication notice that every possible unknown

1  creditor may read and courts, as a result, routinely approve

2  publication notice via national newspapers.  As I mentioned,

3  the debtors here published a bar date notice in three leading

4  publications:  the *Tampa Bay Times*, which was circulated at

5  the debtor's U.S. base of operations in 2013; the *Financial*

6  *Times*, a globally distributed publication, whose 2013

7  circulation exceeded 650,000; and *TradeWinds*, a leading trade

8  publication which bills itself as the global shipping

9  resource.

10       Again, this publication notice plan was

11  specifically considered and approved by Judge Walsh.  I'll

12  note that that decision postdates Grossman's and so,

13  certainly, Judge Walsh was aware of Grossman's and aware of

14  the issues around the sufficiency of publication notice.

15       I think it's important to note that the fact of a

16  specific unknown creditor who may not have subscribed to the

17  *Tampa Bay Times*, the *Financial Times*, or *TradeWinds*, is not a

18  basis on which the publication notice can reasonably be

19  questioned.  And, you know, notably, although, in the motion

20  to Susino's claims that none of these publications, all of

21  which I'll note have digital editions, would have reached a

22  manual laborer at sea, they don't identify what publication

23  would have been better, or for that matter, that Mr. Susino

24  was, in fact, at sea in April 2013.

25       And I think the same is true to the suggestion

1  that the debtor should have caused the publication notice to

2  be published in Italian.  There's simply no basis to suggest

3  that the debtors had an obligation to publish their notice in

4  every conceivable language spoken by individuals who served

5  on OSG-related ships over the last 40 years, and I submit

6  that it wouldn't have been reasonable to do so.

7         Importantly, here, I'll say as well, a couple

8  times this afternoon Ms. Ramsey had suggested that OSG did

9  not make efforts to identify claimants and I think that's

10 simply wrong.  First, as I noted, and is detailed in the

11 pleadings in the primary Chapter 11 cases, the debtors

12 undertook significant efforts to identify all potential

13 creditors and claimants, including former employees, and not

14 only engaged in a series or a (indiscernible) actual notice,

15 via mail, the (indiscernible) filings for all potential

16 creditors they were able to specifically identify, but also,

17 again, specifically undertook publication notice in

18 international publications, in shipping trade publications,

19 in particular, to attempt to identify additional potential

20 claimants.

21        And that system, as we know, and as I mentioned a

22 bit earlier, it worked.  Seven thousand asbestos claimants

23 filed proofs of claim.  They were sufficiently put on notice

24 to assert those claims in a timely way, and they were able to

25 do that via the notice plan that was proposed, prosecute, and

1  confirmed by Judge Walsh.

2          Now, the Susinos rely heavily on the publication

3  notice effectuated in the 2019 EFH bankruptcy, but as set out

4  in our objection and in the cross-motion, EFH did not set a

5  floor for the constitutionality of sufficient notice and, in

6  fact, it's worth noting that in EFH, the ultimate notice plan

7  was the result of heavily litigated objection and a series of

8  contested matters regarding the publication notice; the

9  prosecutor, I should note, by Ms. Ramsey, herself.  And so,

10  it's simply not a comparison to say that because in that

11  case, where unmanifested asbestos claimants were represented

12  by counsel, latent asbestos claimants were represented by

13  counsel, and came in and made specific objections to the

14  notice plan, which were resolved through the modification of

15  the debtor's initial plan, that simply isn't the case here;

16  of course, despite the fact that there were 7,000 asbestos

17  claims filed and a number of prominent asbestos counsel who

18  appeared in the case and prosecuted objections to the case,

19  there was no objection to the publication notice at the time

20  that it was filed or considered by the Bankruptcy Court.

21          And, again, I'll note that, you know, although

22  there are certain examples of extraordinarily robust

23  publication notices like in EFH, bankruptcy courts

24  consistently approve and enforce publication notices that

25  fully align with the debtor's notices here.  And just as a

Case 2:24-cv-05709-MEF Document 6 Filed 11/04/24 Page 48 of 86
Case 21-30080-DSW42 Doc 4613-2 Filed 10/04/21 Page 48 of 56  Desc
Main Document    Page 48 of 86

30

1  few examples, OSG's notice was as or more fulsome than in

2  Your Honor's cases of <u>Swift Energy</u> and (indiscernible)

3  offshore and <u>Sears</u> and (indiscernible), only to name a few.

4          Turning now to the sufficiency of the content of

5  the notice, again, it's practically impossible for a debtor

6  to identify every conceivable basis for unknown liability and

7  that's why courts require only that a bar date notice set out

8  a bar date, explain the procedure for following -- to file a

9  proof of claim, and the consequence of not filing a proof of

10  claim by the bar date.  And the publication notice here

11  plainly contains all of that information.

12          Now, the other point I think that's important to

13  note is that there a -- we've heard a lot about the fact that

14  the publication notice doesn't mention the word "asbestos."

15  There's no proposition of law that requires the debtors to

16  single out a specific class of potential unknown creditors in

17  order for the publication notice, which has been affirmed by

18  this Court, to have binding effect.  And that's particularly

19  true, again, in light of the fact that there were a

20  significant number of asbestos claimants who, after the

21  publication notice and after the filing of the bar date

22  order, came forward in (indiscernible) to assert their claims

23  in a timely way.

24          I'd like to turn briefly to the argument of

25  excusable neglect.  I think the Susinos implicitly concede

1  that the bar date notice, as drafted, bars the asserted

2  claims and so they couldn't have just (indiscernible)

3  permission to file a late-filed claim some eight years after

4  the general bar date.

5          You know, I think that there are several factors

6  that are discussed.  I think the two here that are the most

7  critical are the prejudice that's suffered by OSG and the

8  length of the delay.  Here, the prejudice that would be

9  suffered by OSG is twofold.  First, just taking the

10  (indiscernible) of the claim, it's difficult to estimate the

11  amount of damages that could result from an adverse,

12  (indiscernible) in the Susino action, where the causes of

13  action include loss of consortium, survival claims, punitive

14  damage claims, all in unliquidated amounts.

15          But second, and more importantly, allowing claims

16  like the Susinos to proceed would fundamentally undermine the

17  discharge injunction itself, which is a key feature relied

18  upon by the creditors and equity holders in confirming the

19  plan.  As set out in the Moat declaration, as referenced by

20  Ms. Ramsey this afternoon, dozens of actions have been filed

21  or threatened by would-be personal injury claimants,

22  asserting pre-petition asbestos or other toxic chemicals,

23  exposure to toxic chemicals, and each of them has been

24  successfully addressed by pointing their counsel to the

25  binding provisions of the bar date order, the plan, and the

1  confirmation order.

2        And allowing the Susinos to file proofs of claim

3  with respect to that pre-petition liability could effectively

4  open the floodgates to an untold number of similar requests.

5  Now, I think those harms are only magnified by the fact that

6  the reorganized debtors have not reserved for those claims.

7  (Audio interference) --

8        THE COURT:  You're frozen again.

9        MR. KESSLER:  -- reflects the conscious decision

10  to accept -- I apologize.

11        The problem that we're discussing I think would

12  only be magnified by the fact that there is no reservation or

13  reserve set out for these claims and the Susinos tried to

14  turn that to their advantage by claiming that it reflects a

15  conscious decision to accept unlimited liability in respect

16  to potential future claims, but that's exactly backward.

17        The debtor's decision not to implement a

18  Section 524(g) trust, of course, is not mandatory under the

19  Bankruptcy Code.  It reflects their reliance on the strength

20  and enforceability of the bar date order, the confirmation

21  order, and the plan.  And their comfort, in reliance on those

22  orders, by the time of confirmation, they had fully

23  quantified the scope of liability that would survive the

24  confirmation order, as opposed to liability that would be

25  fully barred and discharged and would not attack the

1   reorganized debtors.  I think the boilerplate disclosures in

2   the disclosure statement that are recognized, that a

3   theoretical possibility of a challenge to the discharge

4   injunction are really not to the contrary, but are, instead,

5   the kinds of anodyne disclosures that you see in all large

6   Chapter 11 cases.

7           Importantly, the harms that I'm discussing are not

8   only going to impact the reorganized debtors, but, of course,

9   the creditors and equity holders who invested billions of

10  dollars into the plan and into the reorganized debtors, in

11  reliance on the plan and confirmation order.

12          I'd also submit that the Susinos' delay here is

13  not exceedingly full.  It comes more than eight years after

14  the general bar date and courts have consistently found that

15  delays of even a year are simply too long and you can see

16  that in the cases we site at paragraph 50 of our opposition

17  and cross-motion.

18          Now, I appreciate that Mr. Susino was diagnosed

19  after the confirmation order and that his death occurred in

20  2018, but I don't believe that that overcomes the nature of

21  the delay, given that, number one, the asserted claims

22  admittedly arose well before his death and, number two, the

23  Susinos provide no explanation for their decision to wait

24  more than three years after Mr. Susino's death to seek relief

25  from this Court.

Case 2:24-cv-12570-DSW Case 1:25-20080-DSW Doc 42 Document Filed 06/12/25 Filed 15/04/24 Page 52 of 86 Page 246 of 641 Desc Main Document

34

1       The Susinos separately claim that the Chapter 11

2   cases should be reopened to allow them to pursue insurance

3   coverage.  As we mentioned in the opposition, Your Honor,

4   even if the debtors were able to confirm coverage for the

5   asserted claims, which they have not been able to do, the

6   debtors don't have typical insurance; rather, they

7   participate in something called P&I club, which operate on a

8   strict "pay to be paid" basis.  And that first would require

9   a judgment against OSG or some settlement that P&I club would

10  approve.

11      And I would also note that, that point, in terms

12  of the insurance coverage, is undisputed, based on my read of

13  the reply, so there really is no basis to reopen the case for

14  some separate purpose, to try to pursue non-existent

15  insurance coverage.

16      Your Honor, I very briefly now will just turn to

17  the cross-motion.  As we've been discussing, the confirmation

18  order and plan squarely preclude the asserted claims from

19  being asserted against OSG and this Court has to reserve the

20  authority to enforce the confirmation order.

21      For their part, I think the Susinos implicitly

22  concede that they have violated the confirmation order by

23  seeking to file a late-filed claim months after filing suit

24  against OSG, by asserting claims that are predicated on the

25  very pre-petition liability they failed to timely assert in

1  the Chapter 11 cases.  Given the clear violations of the

2  confirmation order, we would request that the Court issue an

3  order directing the Susinos to dismiss the Susino action with

4  prejudice.

5          And, finally, Your Honor, to the extent that the

6  Court believes there is some remaining nuance or further

7  factual or legal determination that needs to be made in

8  respect of the asserted claims, we submit that the interests

9  of judicial economy are best served by exercising permissive

10  abstention in favor of the pending Susino action in the

11  Virgin Islands where, as we've discussed, OSG has sought

12  dismissal of the plan on the basis of the confirmation order.

13          We addressed the relevant factors in our brief and

14  I won't retread them unless Your Honor has any particular

15  questions, but I'll note that we think that it's clear that

16  the Virgin Islands Court has the ability to determine the

17  dispute and that's particularly true in the event that the

18  (audio interference) issues are not outcome determinative,

19  which we believe they should be, but in the event that

20  they're not, there may be any number of issues that relate to

21  substance (audio interference) asbestos law (audio

22  interference) as well as (inaudible) due to the sheer number

23  of (audio interference) in that action.

24          (Audio interference) other issues Your Honor may

25  address I'll, again, cede the podium to Ms. Ramsey.

1          THE COURT:  No, thank you.

2          Ms. Ramsey?

3          MS. RAMSEY:  Thank you, Your Honor.

4          I'd like to start with sort of the unique nature

5   of unmanifested asbestos claimants, and that's what we're

6   talking about here, and I think that is what OSG's argument

7   in this is.  Unmanifested claimants are people who don't know

8   they have claims, by definition.

9          And what happened here, with respect to provision

10  of notice to asbestos claims and the asbestos claims filed is

11  you had present asbestos claimants who filed.  There's

12  nothing in the record whatsoever that suggests that any

13  unmanifested asbestos claimant responded to the bar date

14  notice and that makes a lot of sense why they wouldn't have.

15  How could they have known that their claim was intended to be

16  barred?  How could they know that they would develop an

17  injury, based upon the content of the notice here?

18          Just to review a little bit -- and this comes from

19  the debtor's disclosure statement, again, referencing

20  pages 46 and 47 -- there's a discussion about the debtor's,

21  the 7,000 claims that were filed in response to the bar date.

22  And the debtors said, as follows:

23          "The vast majority of the proceedings to which

24  asbestos claims relate were initiated between 1986 and 2000

25  in the United States District Court for the Northern District

Case 2:24-cv-01757-MSG Document 42 Filed 06/23/25 Page 55 of 86
Case 1:25-ap-01080-MSG Doc 46-3 Filed 15/04/21 07/06/23 16:56:41 Desc
Main Document    Page 55 of 86

37

1    of Ohio and subsequently transferred to the United States

2    District Court for the Eastern District of Pennsylvania,

3    where they have been consolidated into multi-jurisdictional

4    litigation."

5            And I'm skipping some of the words here to

6    simplify.

7            "The asbestos proceedings," and they go on,

8    "typically accuse the debtors and nondebtor OSG Defendants,

9    of, among other things, negligent maintenance of their

10   vehicles, negligence under the (indiscernible) Act and

11   unseaworthiness under the general admiralty and maritime law.

12   The asbestos proceedings typically demanded damages in an

13   unliquidated amount on account of loss of earnings, pain and

14   suffering, and an array of other costs, in addition to

15   punitive damages.  They allege injuries stemming from alleged

16   exposure in the 1960s through the 1990s.  The vast majority

17   of asbestos claims relate to asbestos proceedings that were

18   dismissed by the multidistrict litigation court, prior to the

19   petition date."

20           And then they go on to talk about an agreement

21   that they reached, subsequently, with the lawyer who

22   apparently represented the vast majority of those 7,000

23   claimants; something like 6300 of them.  And so, what you're

24   talking about is current claimants who responded to a bar

25   date order that they probably received direct notice of,

1    because they were in litigation with the debtor at the time.

2        Also, I wanted to return to the debtor's effort to

3    make sure that direct notice went to a whole bunch of people.

4    And it's clear that if you trace through the bar date motion,

5    what the bar date motion that was approved by the bar date

6    order says is that the debtors were looking to provide direct

7    notice to all current and former employees of the debtors

8    that left the employ of the debtors on or after the petition

9    date.

10        So, there was no effort, in the first instance

11    here, to get any notice to any former employees who were no

12    longer employed as of the petition date, which is how, then,

13    when the bar date motion traces further down, it comes to be

14    that a number of potential claims are specifically defined as

15    including claims of former employees.  So, here, really, what

16    you have was a very, very limited notice to the employees.

17        With respect to the specific unique nature of

18    contingent claims, the Third Circuit in EFH, went through

19    quite a long discussion about the fact that it is precisely

20    the latency and the length of time between injury or between

21    exposure and manifestation that had caused the Court in the

22    Combustion Engineering case to talk extensively about the

23    requirements to bind future claimants in that case.

24        And the Court went on to say that with respect to

25    the bar date in the EFH case -- and I'm going to read some of

Case 2:24-cv-... Case 1:25-... Doc 42 Doc 46-13/2 Filed 15/04/21 07/20/24 Page 57 of 86 41   Desc
Main Document    Page 57 of 86

39

1  what the Third Circuit said, because it's directly responsive

2  to the argument that you just heard:

3        "First, all latent claimants will have the

4  opportunity to show that reinstatement would pose no danger

5  of prejudice to the debtors here."

6        As we've explained, the prospect of a post-

7  confirmation procedure (indiscernible) for reinstatement, in

8  that case, was baked into the procedure.  Here, what you have

9  is really a complete disregard of the potential of

10  unmanifested claims.  Second, latent claimants will have the

11  opportunity to demonstrate a reason for the delay by showing

12  that they would otherwise be deprived of due process under

13  Grossman's.

14        As we made clear in that case, a latent claim

15  cannot be constitutionally discharged if the claimant

16  received inadequate notice of the claims bar date, a concern

17  that arises starkly in the situation presented by persons

18  with asbestos injuries that are not manifested until years or

19  even decades after exposure, citing to Grossman's.

20        "Because persons in the exposure-only category may

21  not even know of their exposure, may not realize the extent

22  of the harm they may incur, or even if they fully appreciate

23  the significance of the notice they did receive, without

24  current afflictions, may not have the information or

25  foresight needed to decide intelligently whether to file a

1  claim," citing to Amchem.

2          For that reason, we identified in Grossman's,

3  factors bearing on the adequacy of the notice of the claims

4  bar date, including with particular relevant for the

5  Rule 3003(c)(3) proceedings we consider today, whether the

6  notice of the claims bar date came to the claimants'

7  attention, whether and/or when the claimants were aware of

8  their vulnerability to asbestos, and whether the claimants

9  had a colorable claim at the time of the bar date, thus,

10  latent claimants will have a chance to argue, based on these

11  factors, that the permanent discharge of their respective

12  claims would not comply with due process under Grossman's;

13  undoubtedly, an adequate reason for the delay and obtaining

14  restatement under Rule 3003(c)(3).

15          Finally, while the length of the delay between the

16  bar date and latent claimants' Rule 3003(c)(3) motions will

17  be substantial, latent claimants will not be precluded from

18  arguing the delay, have no impact on the bankruptcy

19  proceedings, because those proceedings concluded with a

20  confirmation order.  So, this factor, too, cuts in favor of

21  granting their 3003(c)(3) motions.

22          In sum, our excursion through the Rule 3003(c)(3)

23  factors convinces us that the rule the capable of providing

24  latent claimants with a fair opportunity to seek

25  reinstatement.  It allows them to argue that their late

 1   bounds would impose no prejudice on their EFH, here, OSG, and

 2   that the length of their delay would not affect any

 3   bankruptcy proceeding.  It, likewise, allows them to argue

 4   that without reinstatement, they would not be afforded due

 5   process under Grossman's.

 6            That is exactly the situation we have here.  There

 7   can be no delay or significant delay or undue delay by an

 8   individual who could not possibly have responded to the bar

 9   date because they were unmanifested and once manifested,

10   then, came into this court.  As the Court is aware, there has

11   been an ongoing dialogue back and forth where the debtor was

12   proposing or suggesting or encouraging that these claimants

13   withdraw and these claimants were asking the debtor to agree

14   that based on the lack of adequate due process here, that

15   they be permitted to proceed, and, ultimately, unable to

16   resolve that between themselves, this motion was filed.

17            So, I just want to conclude with the end of the

18   EFH decision, because it's entirely consistent with what

19   happened here.  You have a very sophisticated debtor with

20   very sophisticated other parties who have been involved in

21   this case, all of them understanding the prospect that there

22   were asbestos claims out there.  None of them doing anything

23   to protect the interests of the unmanifested claimants and

24   electing that they would move forward without seeking to take

25   advantage of the various potential ways that they could have

1   tried to deal with those liabilities, either through a 524(g)

2   trust or through a robust bar date process that was designed

3   to provide them with the greatest opportunity to argue that

4   they had done all they could under the circumstances to

5   provide due process notice to these claimants.

6          The Third Circuit at the end of the EFH case

7   stated:

8          "Though we decline to upset the approach taken

9   here, we share the Bankruptcy Court's regret that the debtors

10  asked for a bar date in the first place both, because the bar

11  date might adversely affect claimants who have manifested

12  injury or will manifest injured, based on pre-petition

13  exposure, who have not filed proofs of claim and because it

14  led to a lot of litigation and a lot of expense and a two-

15  million-dollar noticing (indiscernible).  Indeed, this case

16  serves as a cautionary tale for debtors attempting to

17  circumvent 524(g).

18         The alternative route EFH has chosen for

19  addressing its asbestos liability has produced a similar

20  result as a 524(g) trust:  reimbursement for latent claimants

21  who either filed proofs of claim or did not receive notice of

22  a bar date, but with added and unnecessary back-end

23  litigation."

24         So, that is what we have here.  OSG has had to

25  understand that in every asbestos trust, you have trusts that

Case 2:24-cv-01580-MSW Case 18-50080-MFW Doc 46-12 Filed 12/18/21 Filed 16/04/21 07/26/24 16:56:41 Desc
Main Document    Page 61 of 86

43

1  go on for 40, 50, 60 years to account for the latency; that

2  is a feature of asbestos litigation.  Being a Defendant in

3  asbestos litigation, OSG knew or should have shown that that

4  was a risk that they were undertaking here.  They did not

5  address it.

6          And to conclude with the Third Circuit's words, we

7  are not charged with ensuring that EFH's strategic choices

8  were optimal or even advisable; we are merely asked to ensure

9  that they satisfied the Bankruptcy Code and the Constitution.

10 And because the Third Circuit concludes that there is an

11 opportunity for unmanifested claimants to come back in and

12 raise the precise kinds of circumstances that we have here,

13 the Court concluded that their due process considerations

14 were satisfied with the exception or with the *caveat* that an

15 important part of that was the express determination that

16 latent claimants could come back and make a colorable claim

17 that they did not receive notice.

18         And that was in the context of the EFH case,

19 where, if the Court were to take a look at Docket 4985 at

20 pages 8 and 9, there is a detailed description of what the

21 notice was in the EFH case for unmanifested claimants, which

22 included a cover letter, a publication notice, an asbestos

23 bar date notice, a claim form mailed via First-Class Mail, to

24 the known holders of asbestos claims currently pending, as

25 well as known asbestos claimants counsel with respect to

Case 2:24-cv-01050-DPW Case 14-10979-CSS Doc 42 Doc 14618-2 Filed 12/21/14 Filed 10/04/21 Entered 12/21/14 Page 16:44:41 Desc Main Document Page 62 of 86

44

1  those claims, also, to individuals identified as current and

2  past employees and contractors of the debtors and their

3  predecessors, who may have been exposed to asbestos.

4          In addition to all of that direct notice, there

5  were consumer publications appearing in *AARP*, *American*

6  *Legion*, *National Geographic*, *Parade*, *People*, *Reader's Digest*,

7  and *VFW*.  There was 226 local newspapers covering geographies

8  around the plants relating to EFH.  There were national

9  publications in *The New York Times*, *USA TODAY*, and *The Wall*

10  *Street Journal*.  There were 43 local Spanish-language

11  newspapers covering areas near where EFH operated plants.

12  There were 11 union, labor publications, in which the notice

13  was published.  There was online media, featuring banner

14  advertisements on AARP.com, (indiscernible) network,

15  Facebook, MSN, Yahoo, (indiscernible) network, all nationally

16  displayed.  There was an informational release, a party-

17  neutral, court-approved, informational release distributed to

18  approximately 4,200 print, broadcast, and 5,500 online press

19  outlets throughout the United States.  There were sponsored

20  search listings.  There was a website, separate from the

21  Chapter 11 case that contained neutral information that was

22  designed to be easily understood.  And there was message

23  content focus, which was intended to provide, in the words of

24  the notice, a clear, concise, plain-language text.

25          All of those features were present in EFH and

Case 2:24-cv-01050-MSW Case 18-20090-MSW Doc 4612 Filed 03/22/24 Filed 15/04/24 Page 45 of 86 Page 63 of 86 Desc
Main Document    Page 63 of 86

45

1  still, the Third Circuit, in evaluating the appeal from that,

2  recognized the rights of unknown claimants in the context of

3  all of that.  And this was just national; there was no

4  international aspect to the EFH asbestos liability.  This was

5  all done and still the Third Circuit noted the importance of

6  the right of latent claimants to come back and say, despite

7  all of that, it was still not effective to me.

8        Here, we have a fraction -- not even a fraction --

9  we have practically no notice, no content, no delivery, no

10  effort at other languages, no effort to reach former

11  employees.  So, it is absolutely necessary, under binding

12  Third Circuit precedent for the Court to have the opportunity

13  to consider these issues in the context of latent claimants

14  and assess whether here, like in EFH, the debtor made a

15  decision which it may end up now regretting, but it made a

16  decision to not pay attention, not to take care of, not to

17  attempt in good faith, to bind the unmanifested claimants

18  during this bankruptcy.

19        THE COURT:  All right.  Thank you.

20        Anything more, Mr. Kessler?

21        MR. KESSLER:  Your Honor, just three points, very

22  briefly.  First, I would note -- and I will admit that my

23  recollection of this is a bit hazy, but I spent a lot of my

24  junior years dealing with the asbestos claims in OSG -- a

25  significant number of them were asserted by claimants who had

1   what we'll refer to as unmanifested injuries.  There are

2   omnibus proofs of claim filed by Mr. Kellerman, who I

3   remember quite well.  They had their claims removed from the

4   underlying mardock (phonetic), because they had simply not

5   generated a cognizable injury under applicable law and yet,

6   they, nonetheless, were able to file claims in the

7   bankruptcy.  There were many thousands of them.

8           I think it's just simply not accurate to say that

9   there was no effort or ability for former employees who

10  believed that they had been exposed to asbestos, to assert

11  their claims.

12          The second, briefly on noticing efforts, I think

13  the distinction between employees and former employees is

14  really irrelevant here, where, even in response to its

15  specific request to identify records for this specific

16  employee, we've been unable to identify any record of

17  Mr. Susino's sea service.  And so, even if there had been an

18  exacting process through which every former employee that the

19  OSG debtors had records of, had been notified, it did not

20  include Mr. Susino.

21          Third, just to end on EFH as Ms. Ramsey did, a

22  couple of points.  First, no one is disputing that there is a

23  process by which claimants can make a claim that they should

24  be excused from the in-court bar date order.  No one is

25  disputing that.  No one is claiming that there is no ability

1  to seek some recompense of the Court.  And EFH, again, talks

2  in this sort of permissive language about the ability of

3  people to make attempts.

4        Again, to the extent that EFH is intended to serve

5  as a cautionary tale, and I appreciate that the asbestos

6  counsel in that case was able to obtain one of the most

7  comprehensive, elaborate notice provisions, publication

8  notice provisions that I've ever seen, that simply isn't the

9  standard and, in any event, it was some number of years after

10  OSG, in fact, the Third Circuit's decision, you know, several

11  years after the cases closed in OSG, and so, obviously, it

12  couldn't have served as the model, a cautionary tale or

13  anything of the like.

14        And the idea that the principle of EFH, which is

15  that it is possible to make an individual, by its showing,

16  should somehow be read to allow unmanifested asbestos

17  claimants to assert their proofs of claim against debtors

18  into perpetuity, would be contrary to the provisions of the

19  Bankruptcy Code, where there is no requirement for a 524(g)

20  trust.  It would be contrary and effectively would overrule

21  Grossman's, which clearly is not what the Third Circuit

22  intended to do in EFH.  And so, I believe that EFH simply

23  does not carry the weight that the Susinos would like it to.

24        And maybe just finally on the issue of the efforts

25  of the parties to negotiate and to make efforts to resolve, I

1   will admit there were three letters exchanged, but I think

2   that's -- the time period that that is talking about is

3   really irrelevant to the point that Mr. Susino was allegedly

4   diagnosed, and I think I wrote down 2013.  He died in 2018.

5   And, again, no action was taken in the territorial court in

6   the Virgin Islands or in this court at any point until 2021,

7   between three and seven years after the manifestation of the

8   alleged injuries and Mr. Susino's death.  And I would submit

9   that that length of delay, irrespective of the other issues

10  we've discussed, is simply not (indiscernible).  Thank you,

11  Your Honor.

12          MS. RAMSEY:  Your Honor, may I have two last

13  words, if I keep it very brief?

14          THE COURT:  If you keep it very brief, thank you.

15          MS. RAMSEY:  Thank you, Your Honor.

16          One is, I believe that Mr. Kessler is incorrectly

17  referring to unimpaired claims as unmanifested claims, that

18  is, according to all of the documents.  And if the Court were

19  to read the debtor's disclosure statement, it's, again, at 46

20  and 47, it's very clear that the claims that were filed by

21  the bar date that Mr. Kessler is recalling, were unimpaired

22  claims.  Those are present claims where there's an indication

23  of fiber in the lungs, asbestos fiber in the lungs.  Those

24  claims are typically not pursued until there is an asbestos

25  disease that has developed.  But those folks are on notice

1  that they might develop an asbestos disease, and so in order

2  to preserve the statute, they filed claims.  That is

3  different than an unmanifested claimant, who has absolutely

4  no knowledge that they're going to develop an injury in the

5  future.

6          And the second is with respect to Mr. Susino and

7  the assertion, well, we can't find him in our records, and,

8  you know, questions of -- you know, it sounds like almost an

9  argument that he didn't file within the statute of

10 limitations, although I haven't heard it said that way, those

11 are defenses that can be raised and addressed by a Trial

12 Court and appropriately can be; again, OSG can defend on any

13 basis that it believes it has if these cases were to proceed.

14         And then, finally, I think the statement regarding

15 Grossman's is incorrect.  Grossman's specifically did

16 indicate that latent claimants are -- can be diagnosed for

17 many, many years and that in the asbestos context, the fact

18 that latency is both, been very delayed in being manifested

19 and, therefore, in those individuals being able to make a

20 claim is to be anticipated.  Thank you.

21         THE COURT:  Okay.  I have one question of you,

22 Ms. Ramsey, because I think Mr. Kessler made a misstatement.

23 He suggested that Mr. Susino did not get the diagnosis about

24 exposure or got the diagnosis in 2012 or 2013, but I think in

25 your papers, it suggested not until 2017, did he know.

1          MS. RAMSEY:  That's correct.  I think that was a

2     misstatement, Your Honor; yes, that is correct, he was not

3     diagnosed until 2017.

4          MR. KESSLER:  I apologize, Your Honor.  I have it

5     written down incorrectly in my notes.

6          THE COURT:  All right.  Thank you.

7          All right.  Well, let me make my ruling.  Well,

8     you certainly both made me go back and reeducate myself on

9     asbestos claims.

10          But just to set my ruling, in contest before the

11    Court are the motions of Ms. Susino to reopen the case,

12    modify the discharge injunction to permit her to file a late

13    proof of claim and pursue insurance, and the debtor's

14    objection to those motions and its cross-motion to abstain,

15    in part.

16          The claimant asked the Court to allow her late-

17    filed claim because she did not have actual notice of the bar

18    date, did not have actual notice that she had a claim,

19    through her father had a claim, and as the colloquy about the

20    timing of the diagnosis makes it clear that any knowledge

21    that there might be a claim, did not arise until 2017, which

22    is long after the filing of the debtor's case, long after the

23    bar date, long after the filing and confirmation of the

24    debtor's plan, and even long after the case was closed.

25          The debtor contends that it provided the requisite

1  publication notice because Ms. Susino was an unknown creditor

2  and that there are legions of cases that say that unknown

3  creditors are entitled only to publication notice and that

4  the provision of publication notice will allow the discharge

5  of those claims.

6         Ms. Susino asserts that the notice, the

7  publication notice was not adequate because it was not

8  designed to reach a creditor, such as her father, who was a

9  common, able-bodied seaman or laborer, who had served on the

10 debtor's vessels, but lived in Italy.  And she points to

11 publication notices in asbestos cases that she asserts are in

12 stark contrast to the publication notice that the debtor has

13 provided here.

14        The Court agrees with Ms. Susino here, that the

15 publication notice was not adequate with respect to the type

16 of claim at issue here.  I note that in asbestos cases,

17 particularly, publication notice is far more extensive.  EFH

18 does detail the notice provided in that case and while it was

19 provided or issued long after the debtor's publication

20 notice, there are many other cases, such as the Flintkote

21 decision, which evidenced a publication notice in 87

22 publications in the United States, 41 in Canada, as well as

23 other efforts to get notice to unmanifested asbestos

24 claimants that they might have a claim and will be required

25 to file a claim.

Case 2:24-cv-1... Case 1:25-20... Document 42 Filed 12/2... Filed 15/04/21 03/20/25 16:641   Desc
Main Document    Page 70 of 86

52

1          In this case, the publication was once in only

2    three publications and according to the creditors, not

3    published in any publication that a common laborer or able-

4    bodied seaman, who had served on the debtor's vessels, could

5    honestly be expected to have read.  I don't expect seamen

6    read the *Financial Times* or even industry publications to

7    shipbuilders.

8          And I think that the Third Circuit in both,

9    Grossman's and EFH, point out the difficulties that debtors

10   face when dealing with asbestos claims, particularly,

11   unmanifested claims.  They point out that 524(g) avoids the

12   risk of having to rely on publication notice and that a

13   debtor who does not take advantage of 524(g) runs the risk

14   that despite the passage of the bar date, late-filed, future

15   asbestos claims can be allowed, even where publication notice

16   was appropriate, under the excusable neglect standard

17   articulated by the Supreme Court in Pioneer.

18          Excusable neglect allows a creditor to file a late

19   claim, even if the creditor has been careless; in fact,

20   that's what negligence means.  And while it's stated that it

21   must be excusable, as pointed out by the Third Circuit in

22   EFH, the Pioneer standard is a low threshold to meet the

23   Pioneer standard.  It is low in asbestos cases and latent-

24   asbestos claims.  Applying the Pioneer standards here,

25   there's no contention that the creditor did not act in good

1  faith and I find that she did.

2         The reason for the delay is that the creditor did

3  not know it had a claim until long after the bar date

4  confirmation and closing of the case, and, again, that is

5  understandable and not unusual in asbestos cases, because the

6  damage of exposure to asbestos has a particularly long latent

7  period.  And the Third Circuit in Grossman's acknowledged

8  that persons in the exposure-only category may not even know

9  of their exposure, may not realize the extent of the harm

10  they have incurred, or even if they fully appreciate the

11  significance of the notice they did receive, may not have the

12  informational foresight needed to decide that they should

13  file a claim.

14         So, in this case, the Court finds that the reason

15  for the delay is understandable and a legitimate one.  The

16  length of the delay is substantial:  more than eight years

17  since the bar date, seven years since confirmation, and four

18  years since the cases were closed.  But, once again, that is

19  not unusual for asbestos, unmanifested-asbestos claims and,

20  in fact, is to be expected, quite frankly, and that is why

21  EFH makes it clear that a process of allowing a late claim on

22  a Rule 3003 and just general equitable standards provides

23  what, otherwise, would be a forfeiture of unmanifested

24  asbestos claimants' rights.

25         And I think it's particularly important to note

1 here -- it was not raised by the parties -- but it appears

2 the debtor has suggested that 524 is not required to be used

3 by all debtors that may have an asbestos problem and that is

4 absolutely true.  And, in fact, I place no blame on the

5 debtor for not using a 524(g) trust in this case, because

6 based on the disclosure statement, it appears that the

7 debtor's financial problems were not caused by asbestos

8 claims, but, instead, were caused by, among other things, the

9 need to restate its financial statements and the impending

10 maturity on its debt obligations.  And it's, I think, though,

11 of significance that because of that, the plan provided that

12 asbestos claims that were not otherwise disallowed in the

13 bankruptcy case, would pass through, unimpaired, by the plan.

14        So, I think that in considering that, I think that

15 the danger of prejudice to the debtor weighs in favor of the

16 creditor.  The debtor did take the risk that unmanifested-

17 asbestos claims that were not disallowed in this bankruptcy

18 case, may nonetheless, still be asserted against it because

19 they were unimpaired.  And the debtor also took the risk

20 that, as stated in Grossman's and later in EFH, that

21 unmanifested asbestos claimants may have a process to allow

22 their late claims under Bankruptcy Rule 3003.

23        And, therefore, as the EFH Court said, the fact

24 that there is this process which would allow late claims,

25 cannot be held to alter the expectation of the debtor or the

1   other parties in the bankruptcy case, cannot alter their

2   expectations that confirmation or a discharge in confirmation

3   order would protect them, because that would not be a

4   reasonable expectation.

5          And the late claims' potential impact on judicial

6   proceedings, I conclude, is slight here, just as <u>EFH</u>

7   concluded it was slight in that case.

8          The fact that the plan of reorganization was

9   confirmed and the case has been closed actually helps these

10  latent creditors because there will be absolutely no impact

11  on OSG's bankruptcy proceedings now because those bankruptcy

12  proceedings are concluded.

13         Accordingly, I will grant the motions to reopen

14  the case, modify the discharge, and allow the Ms. Susino to

15  file a late proof of claim, having met the excusable neglect

16  standard of <u>Pioneer</u>.

17         And I will deny the debtor's cross-motion to

18  enforce the confirmation order; however, I will grant the

19  debtor's motion to abstain, in part, and I agree with the

20  debtor's articulation of the standard of permissive

21  abstention.  I will abstain from considering the other

22  objections that the debtor may have to the Susino claim.

23         Because it is a PI claim, I don't have

24  jurisdiction to determine the amount of that claim and there

25  is a pending case already filed in the Virgin Islands dealing

 1  with the allowance of that claim, and the Virgin Islands

 2  Superior Court is perfectly capable of considering that claim

 3  and any defenses, other than the bankruptcy defenses or

 4  issues that I have disposed of in this ruling.

 5          I would ask the parties to submit a form of order

 6  consistent with this ruling under certification of counsel.

 7          MR. KESSLER:  Very well, Your Honor.  (Audio

 8  interference) have that submitted.

 9          THE COURT:  All right.  Anything else, though,

10  today, I think not?

11          MS. RAMSEY:  That's it from the Susinos.  Thank

12  you, Your Honor.

13          THE COURT:  All right.  Thank you.

14          We'll stand adjourned, then.

15          MR. KESSLER:  Thank you, Your Honor.

16       (Proceedings concluded at 3:26 p.m.)

17                        CERTIFICATE

18

19      I certify that the foregoing is a correct transcript

20  from the electronic sound recording of the proceedings in the

21  above-entitled matter.

22
    /s/Mary Zajaczkowski              October 1, 2021
23  Mary Zajaczkowski, CET**D-531

24
    /s/William J. Garling             October 1, 2021
25  William J. Garling, CE/T 543

**DECLARATION OF DANA NYE**

I, Dana Nye, hereby declare as follows:

1.    I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto. I am the President of Ben Nye Co., Inc., debtor and debtor in possession in the above captioned bankruptcy case (the "Debtor") and manage the day-to-day operations and affairs of the Debtor.  Based on the foregoing, I am familiar with and knowledgeable about the operations and financial records of the Debtor.

2.    I submit this declaration in support of the *Motion For An Order: (1) Setting Bar Dates For Filing Proofs Of Claim Arising From Asserted Asbestos Related Injuries And (2) Approving Form And Manner Of Notice Of The Bar Date For The Filling Of Asserted Asbestos Related Injury Proof Of Claims* (the "Motion") to which this declaration is attached.

3.    Ben Nye Co., Inc., a California corporation, (the "Debtor" or "BNC" or "Company") commenced its bankruptcy case by filing a voluntary petition under chapter 11 of title 11, sections 101 *et seq.* of the United States Code (the "Bankruptcy Code") on March 11, 2024, (the "Petition Date").  The Debtor elected subchapter V on its bankruptcy petition and is a small business debtor as defined by 11 U.S.C. § 1182(1). The Debtor continues to manage its financial affairs, operate its business, and administer its bankruptcy estate as a debtor in possession pursuant to sections 1182(2) and 1184 of the Bankruptcy Code.

**A.    General Background**

4.    The Debtor was founded in 1966 by Ben Nye, Sr., a renowned make-up artist whose career spanned four decades.

5.    Ben Nye Sr. served as makeup director of 20th Century Fox Studio ("Fox Studio") for 23 years and supervised the production of over 500 feature films. He worked on the iconic "Gone with the Wind", making up Olivia de Havilland, Leslie Howard and Hattie McDaniel, the first Black actor to win an academy award. In 1968, Ben Nye Sr. was awarded a special Academy Award for Makeup for his last film work on "Planet of the Apes."

6.    Based on his vast experience, Ben Nye Sr. developed his own line of professional cosmetics especially formulated for high intensity lighting and durability. He also designed

make-up for every skin tone, including a complete line for Black, Hispanic and Asian performers. After he retired from Fox Studio in 1967, he began selling his own line of makeup primarily to film studios.

7.    In 1970, Ben Nye Sr.'s son, Dana Nye, joined the company as Vice President of Sales and began marketing the Ben Nye make-up line to college and high school drama departments across the country. The Company began advertising in Theatre Craft, an industry magazine circulated to drama departments and theatre companies and began exhibiting at trade shows catering to costume shops and contacting theatre supply houses. Over the years, the Company developed an extensive line of student makeup kits designed for the educational theatre marketplace.

8.    In May 1975, Ben Nye Sr.'s health declined, and Dana Nye become the Company's President. In July 1979, Dana Nye purchased all of the Company's shares and became the sole shareholder until March 2020, when Dana Nye assigned his BNC shares to the "Dana Nye and Gina Nye, as trustees of the Nye Family Trust U/T/D April 11, 2012."

9.    As president, Dana Nye has been dedicated to enhancing the quality and image of BNC products. He has traveled extensively exhibiting at trade shows and building a network of authorized dealers, who own brick and mortar stores marketing to the performing arts.  The Company's market has not been directed toward the general public, commonly referred to "streetwear" make up.

10.    The Company is a family business with a good work environment. Of its 35 employees, 16 employees have worked there between 11 to 38 years. Excluding the owners, the average service tenure is 13 years. The knowledge and productivity of its employees has been instrumental in developing new products, improving product quality and providing excellent product delivery.

11.    Today, the Company is considered a leading manufacturer of professional cosmetics, which are sold throughout the United States and abroad. It is recognized for its high quality, extensive product line and excellent customer service.

///

### B.    The 2017 BNC Revenue Rise and Challenges Thereafter

12.    In 2013, the Company had gross revenues of $8,732,138.  In a 2014 interview Kim Kardashian's make-up artist mentioned he used the Company's banana powder on Kim. Given Kim Kardashian's celebrity star status, this interview sparked a surge in public demand for the Company's banana powder and boosted sales of other Company products, resulting in 2014 gross revenue of $10,157,999. In response, however, most of the Company's competitors copied the banana powder, and Kim Kardashian introduced her own line of make-up, as well, cutting deeply into the Company's sales for the next few years. By 2017, the unusually high demand for BNC products subsided, and BNC revenue fell back to the 2013 levels.

13.    By 2018, long-time brick and mortar dealers began to retire or close business in response to e-commerce. The Company's largest dealers transitioned to expand their on-line business.  For the first time, the Company's revenue started to decline, but the business remained marginally profitable.

14.    In 2020, the impact of the Covid-19 pandemic, hit the Company very hard.

15.    Covid-19 restrictions shut down the performing arts, and colleges, universities, and Halloween activities stopped. The Covid-19 revenue impact on the Company's business was devastating as the Company's gross revenues fell 42% from the prior year.

16.    Despite terminating 25% of the Company workforce, managers taking payroll cuts, and the Company cutting all expenses to the bone, the Company incurred a significant net loss of $718,304 in 2020.

17.    In the second half of 2021, Covid-19 restrictions eased, and the business started to slowly recover. Although 2021 revenue fell back to the 2005 level, the Company managed an operating income of $258,102. The Company's net income was significantly boosted to $2,045,644 from two forgiven PPP loans totaling $1,182,014, and ERTC filings of $645,865.

18.    In 2023, the Hollywood writers' and actors' strikes and an exceptionally weak Halloween season adversely affected the Company's revenue, which declined to $5,554,300 from $5,809,725 in 2022.

/ / /

## C.  Asbestos Lawsuits against BNC

19.    In December 2004, the Company received a lawsuit filed by Ms. Audrey Giero claiming personal injury from alleged exposure to asbestos allegedly in the Company face powder she used. This was the first lawsuit against the Company for any personal injury claimed from its products. The Company did intensive research and found no evidence of asbestos in its products. The Company did not have insurance for this type of claim and spent about $50,000 in its defense. The case was dismissed in 2005 without settlement.

20.    Seventeen years later, and still while weathering the impact of Covid-19, in July 2021, the Company received its second lawsuit filed by Mr. David Rody claiming personal injury from alleged exposure to asbestos allegedly in BNC face powder he had used. The Company denies that it manufactured face powders that contained talk with asbestos. In the Rody case, the Company was among 60 defendants and vigorously defended its position, spending $513,929 in legal fees, including a settlement of $37,500 in May 2023.

21.    Since July 2021, the Company has been named as a defendant in eight (8) more asbestos lawsuits. In these lawsuits, the Company is named with multiple defendants, including many very large well-known companies, (e.g., Maybelline LLC, Kaiser Gypsum Company, Inc., and Walgreen, Co., among many others).

22.    Asbestos related personal injury lawsuits are complex and expensive to defend, and the Company has no insurance for its defense. The Company legal fees defending these cases have steadily risen. The Company incurred related legal fees of $62,513 in 2021, $301,945 in 2022, and $407,289 in 2023. These continued legal fees are unsustainable for the Company. The twin burdens of legal fees and revenue decline outside of the Company's control resulted in a net income loss of $453,102 for the year ending December 31, 2023. As a result the cash position has been substantially depleted.  The Company is a defendant in an asbestos trial scheduled for April 15, 2024, in California.  Legal counsel has advised the Company that this trial is likely to incur legal fees between $400,000 and $500,000.  Such an amount will fully exhaust the Company's present cash position and effectively stop its ability to operate.

1   Furthermore, the Company would not have any resources to defend against its remaining

2   lawsuits.

3       23.    The Debtor is unaware that it owns any insurance policies that would provide

4   coverage for the Asserted Asbestos Claims. As will be evidenced in the Debtor's to be filed

5   Schedules of Assets and Liabilities, the Debtor is a very small company and has insufficient

6   assets and no source of funding for a Section 524(g) Plan.

7       **D.    Proposed Asserted Asbestos Claims Bar Date and Notice Process**

8       24.    The Debtor proposes that the Court approve the following proposed claims bar

9   date notice process for holders of all existing and future Asserted Asbestos Claims (the

10  "Proposed Notice Process"):

11  - A claims bar date for Asserted Asbestos Claims (the "Asserted

12    Asbestos Claims Bar Date") that provides 45 days' notice of the

13    deadline to file proofs of claim, i.e., May 26, 2024.

14  - The detailed form of notice of the bar date solely for Asserted

15    Asbestos Claims (the "Bar Date Notice") attached hereto as **Exhibit A**.

16  - Service of the Bar Date Notice by first class U.S. Mail on all of the

17    Debtors' existing and former employees, dealers, and the plaintiffs'

18    counsel in the Actions.

19  - Publication of the Bar Date Notice in the following publications:

20    i.  New York Times – National Edition; publish one time no later

21        than two weeks after entry of the order granting this Motion

22        (the "Order");

23    ii. Los Angeles Times – publish on two dates (no later than two

24        (2) weeks after entry of the Order, and no later than four (4) weeks

25        after entry of the Order);

26    iii. Variety -- publish on two dates (no later than two (2) weeks

27        after entry of the Order, and no later than four (4) weeks after entry

28        of the Order);

iv.  Mealey's Litigation Report Asbestos -- publish on three dates (no later than two (2) weeks after entry of the Order, four (4) weeks after entry of the Order, and five (5) weeks after entry of the Order, respectively); and

v.  Mealey's Asbestos Bankruptcy Reports -- publish on three dates (no later than two (2) weeks after entry of the Order, four (4) weeks after entry of the Order, and five (5) weeks after entry of the Order, respectively)

25.  The Debtor believes that the Proposed Notice Process is robust and will provide both existing and future claimants holding Asserted Asbestos Claims more than adequate notice of the Asserted Asbestos Claims Bar Date. The Proposed Notice Process includes a detailed Bar Date Notice that provides all known and future holders of Asserted Asbestos Claims with the information they need to timely file a proof of claim in the Debtor's bankruptcy case, including the Asserted Asbestos Claim Bar Date, who must file a proof of claim, the filing procedures, the consequences of failing to timely file a proof of claim, and where parties can find further information regarding the Debtor's bankruptcy case. The Debtor will mail the Bar Date Notice directly to known potential holders of Asserted Asbestos Claims by first class U.S Mail. In addition, the Debtor proposes to publish the Bar Date Notice in five (5) publications consisting of a national newspapers (the New York Times) the regional newspaper for the area where the Debtor's manufacturing facility is located (the Los Angeles Times), one of the leading entertainment journals as the Debtor manufactures theatrical make-up (Variety), and two (2)

///

///

///

///

///

///

///

1    asbestos litigation reporting services used regularly by plaintiffs' firms that bring Asserted

2    Asbestos Claims actions (Mealey's Asbestos Litigation Reports Asbestos and Mealey's Asbestos

3    Bankruptcy Reports). The Debtor proposes to publish the Bar Date Notice multiple times in a 45

4    day period.  The expansive Proposed Notice Process is specifically designed to notify all known

5    and future holders of potential Asserted Asbestos Claims of the Asserted Asbestos Claims Bar

6    Date.

7        I declare under penalty of perjury under the laws of the United States of America that the

8    foregoing is true and correct.

9        Executed on this /3 day of March, 2024, at Los Angeles, California

11                 DANA NYE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

# Proposed Bar Date Notice for Asserted Asbestos Claims

**UNITED STATES BANKRUPTCY COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**BEN NYE CO., INC., BANKRUPTCY CASE, CASE NO. 2:24-bk-11857-DS**

**BEN NYE COMPANY DEALERS, FORMER AND CURRENT EMPLOYEES, PLAINTIFFS, AND OTHER PARTIES IN INTEREST**

**To Keep Your Right To Compensation If You Have Asbestos Related Illness Today Or If You Become Ill In The Future, You Must Submit A Claim By May 3, 2024, 5:00 p.m. Prevailing Pacific Time.**

A bankruptcy case, under Subchapter V of chapter 11 of the Bankruptcy Code has been filed by the Ben Nye Co., Inc. (the "Company") in the United States Bankruptcy Court for the Central District of California. The Company designs and manufactures professional cosmetics, including face powder, for the performing arts. The Company sells its product to authorized retailers, and some performing theaters. The Company does not sell its products to the general public.

The Ben Nye Company has been sued by several plaintiffs' law firms on behalf of parties that allegedly were exposed to asbestos found in talc used in the face powders manufactured by the Company (the "Lawsuits"). The Company is one of several unrelated defendants named in the Lawsuits, and most of the defendants are much larger companies than the Company. The Company denies that it manufactured face powders that contained talc with asbestos. To date, no plaintiff has obtained a judgment against the Company.

The Company has filed its Subchapter V chapter 11 bankruptcy case to obtain a "clean start" by restructuring its debts. Given the allegations in the Lawsuits (which the Company denies) that people have been exposed to asbestos from the manufacture, sale or use of the Company's face powders, **the Bankruptcy Court has decided that in order to keep your right to compensation if you become ill in the future or have an asbestos-related illness today arising from such exposure, you must submit a claim by May 3, 2024m 5:00 p.m. prevailing Pacific Time (the "Asbestos Claim Bar Date"). Failure to file a claim by the Asbestos Claim Bar Date will result in any existing or future claim against the Company arising from asbestos exposure being barred.**

### What is Asbestos?

Asbestos is a fiber which causes asbestos-related disease that can be very serious or fatal and include diseases such as mesothelioma, lung cancer, laryngeal cancer, esophageal cancer, pharyngeal cancer, stomach cancer, and asbestosis, among other diseases. Even if your exposure was many years ago and you are not sick today, this notice could affect you. Asbestos-related illness can occur decades after the exposure to asbestos caused the illness.

### How Could this Affect Me?

Given the Lawsuits and even though the Company denies that it ever manufactured, distributed, or sold face powder that contained asbestos, you may believe that you may have been exposed to asbestos from the distribution, use or manufacture of the Company's face powder. Asbestos exposure is also possible from coming in contact with another person who was exposed to the face powder (for example, if the product was brought home on a family member's clothing.) You may also file a claim on behalf of a deceased family member.

1

### What do I do Now?

If you believe that you or a family member may have been exposed to asbestos from the manufacture or use of the Company's face powder, you must submit a claim by May 3, 2024, 5 p.m. prevailing Pacific Time. Even if you have not been diagnosed with the disease or experience symptoms, you must make a claim to preserve your right to compensation if you develop asbestos-related illness in the future. Go to https://www.cacb.uscourts.gov/epoc-electronic-proof-claim to submit your claim online. To get a paper claim form, call 310.229.3368 for LNBYG. Submitting a claim preserves your right to ask for money if you develop asbestos-related illness in the future. You can submit a claim yourself or you can ask a lawyer to help you. If you are not ill today, completing a claim takes about five minutes.

### Will I get Money if I Submit a Claim?

Receiving this notice does not mean that you were exposed to asbestos or that you are eligible to receive money now or in the future. If you are not ill today, submitting a claim keeps your right to receive compensation if you become ill in the future. Further, there is no guaranty that the Company's bankruptcy case will result in recoveries for holders of claims, including asbestos-related claims. Further, since the Company filed a case under Subchapter V of chapter 11 of the Bankruptcy Code and depending on the Company's post-bankruptcy financial projections, it is possible that creditors, including creditors holding asserted asbestos-related claims, will receive little if any recovery from the Company.

### What if I do Nothing?

If you do not submit a claim by the Asbestos Claim Bar Date and later manifest asbestos-related disease, you will not be eligible for compensation from the Company. Even if you have not been diagnosed with disease or experiences symptoms, you must make a claim to preserve your right to compensation if you develop an asbestos-related illness in the future.

### Getting More Information

If you would like copies of the Company's Schedules of Assets and Liabilities (the "Schedules"), the Bankruptcy Court order setting the Asbestos Claim Bar Date, and other information regarding the Company's bankruptcy case emailed to you, please contact rmc@lnbyg.com. If you have questions call 310.229.3368, email at rmc@lnbyg.com or send a letter to Robert Carrasco, Esq., Levene, Neale, Bender, Yoo & Golubchik LLP, 2818 La Cienega Avenue, LA, CA 90034.

### Reservation of the Company's Rights

Nothing contained in this Notice is intended or should be taken as the Company giving up rights to: (a) defend against any claim, filed proof of claim or any claim listed or reflected in the Schedules related to the nature, amount, liability or claim classification thereof; (b) subsequently designate any scheduled claim as disputed, contingent or unliquidated; and (c) otherwise amend or supplement the Schedules.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 2818 La Cienega Avenue, Los Angeles, California 90034.

A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION FOR AN ORDER: (1) SETTING BAR DATES FOR FILING PROOFS OF CLAIM ARISING FROM ASSERTED ASBESTOS RELATED INJURIES AND (2) APPROVING FORM AND MANNER OF NOTICE OF THE BAR DATE FOR THE FILLING OF ASSERTED ASBESTOS RELATED INJURY PROOF OF CLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DANA NYE IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 21, 2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Robert Carrasco    rmc@lnbyg.com, rmc@lnbyg.com**
- **John-Patrick M Fritz    jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com**
- **Gregory Kent Jones (TR)    gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com;cpesis@stradlinglaw.com**
- **Eve H. Karasik    ehk@lnbyg.com**
- **Matthew A Lesnick    matt@lesnickprince.com, matt@ecf.inforuptcy.com;jmack@lesnickprince.com**
- **Noreen A Madoyan    Noreen.Madoyan@usdoj.gov**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On **March 21, 2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Ben Nye Co., Inc.
3655 Lenawee Avenue
Los Angeles, CA 90016

Hon. Deborah J. Saltzman
United States Bankruptcy Court
255 E. Temple Street, Suite 1634
Los Angeles, CA 90012

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **March 21, 2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 21, 2024 | Lisa Masse | /s/ Lisa Masse |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

Ben Nye Company, Inc.
Asbestos Lawsuits Service List

Counsel for Stacy & Peter Belanger
Water, Kraus & Paul
Attn: M. Camille Hunt
222 N. Pacific Coast Hwy, Ste 1900
El Segundo, CA 90245

Counsel for Claudia Smith
Maune Raichle Hartley French & Mudd
Attn: David Amell and David Rancilio
6101 W. Centinela Ave, Ste 340
Culver City, CA 90230

Counsel for Gary & James Schmidt
Simon Greenstone, Panatier, PC
Attn: Holly Peterson
901 Main Street, Ste 5900
Dallas, TX 75202

Counsel for Gary & James Schmidt
Sieben Polk P.A.
Attn: Chad Alexander and Michael Strom
2600 Eagan Woods Dr, Ste 50
Eagan, MN 55121-1170

Counsel for Gary & James Schmidt
Maune Raichle Hartley French & Mudd
Attn: Managing Partner
1015 Locust Street, Ste 1200
St Louis, Missouri 63101

Counsel for Russell Kolber
The Gori Law 'Firm
Attn: Sara Salger, Jason Steinmeyer, Erin
Beavers, Martavious Thomas
156 N. Main Street
Edwardsville, IL 62025

Cnsl for Joseph Sniegocki & Robin Watts
Maune Raichle Hartley French & Mudd
Attn: Dawn Besserman
777 S. Harbour Island Blvd, Ste 310
Tampa, FL. 33602

Cnsl for Humberto Machado & Humberto
Machado Jr.
The Gori Law Firm
Attn: Sara Salger, E. Beavers, M. Thomas
156 N. Main Street
Edwardsville, IL 62025

Counsel for Jami & Douglas Sager
The Gori Law 'Firm
Attn: Sara Salger
156 N. Main Street
Edwardsville, IL 62025

Cnsl for Michell Rusinko & Robert
Weisenfeld
Weitz & Luxenberg, P.C.
Attn: Erin Boyle
220 Lake Drive East, Ste 210
Cherry Hill, NJ 08002